Kunyu Ching, CA #292616
Gary DiBianco, DC #458669 (*pro hac vice* forthcoming)
**LAWYERS FOR GOOD GOVERNMENT**
1319 F St. NW, Suite 301
PMB 181
Washington, DC 20004
Phone: (404) 913-5529
kunyu@lawyersforgoodgovernment.org
gary@lawyersforgoodgovernment.org

Courtney Stuart-Alban, CA #225513
Juan Pablo Alban, CA #218144
**STUART ALBAN LAW PC**
87 N Raymond Ave, Suite 200
Pasadena, CA 91103
Phone: (323) 208-9540
courtney@stuartalbanlaw.com
jp@stuartalbanlaw.com

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

**TAMMIE VISINTAINER, MELISSA NAVARRO MARTELL,** and **KARINA GARBESI**, on behalf of themselves and all others similarly situated,

*Plaintiffs,*

v.

**NATIONAL SCIENCE FOUNDATION;** and **BRIAN STONE,** in his official capacity as Acting Director of the National Science Foundation,

*Defendants*.

**Case No. ______________**

**COMPLAINT**

CLASS ACTION

ADMINISTRATIVE PROCEDURE ACT CASE

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. The classroom is peculiarly the marketplace of ideas."

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967).

Plaintiffs Tammie Visintainer, Melissa Navarro Martell, and Karina Garbesi, individually and on behalf of all others similarly situated, allege for their Complaint against the below-named Defendants as follows:

## I. INTRODUCTION

1. This class action for declaratory and injunctive relief is brought by and on behalf of California State University ("CSU") researchers whose previously approved, awarded and funded grants were unlawfully terminated by Defendants National Science Foundation ("NSF") and NSF Acting Director Brian Stone. Plaintiffs' grants were awarded through NSF's rigorous, merit-review process to support multi-year research projects advancing science education, climate education, teacher preparation, and participation in science, technology, engineering, and mathematics ("STEM") fields, in compliance with NSF's congressional mandate. In April 2025, Defendants summarily terminated the grants because they disagreed with the researchers' classroom speech, academic viewpoints, and research topics. Defendants' actions violated Plaintiffs' First and Fifth Amendment rights, the separation of powers doctrine, and the Administrative Procedure Act ("APA") and constituted an unlawful *ultra vires* act. In terminating these grants, NSF has betrayed its congressionally mandated mission and principles.

2. Through enactment of the National Science Foundation Act of 1950, 42 U.S.C. § 1861 et seq., Congress charged NSF with promoting the progress of science, supporting scientific and engineering research, and advancing STEM education. In 1980, Congress passed the Science and Technology Equal Opportunities Act in recognition that for the United States to maintain its competitive edge, NSF must encourage and prepare people from groups traditionally underrepresented in STEM to acquire skills and pursue careers in science and engineering fields. Science and Technology Equal Opportunities Act, Pub. L. No. 96-516, § 32, 94 Stat. 3007, 3010–11 (1980) (codified as amended at 42 U.S.C. § 1885). In 1998, Congress mandated that NSF contribute to mathematics, science, and engineering education in U.S. academic institutions by, among other things, "[d]evelop[ing] intellectual capital, both people and ideas, with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering." National Science Foundation Authorization Act of 1998, Pub. L. No. 105-207, §

101(b)(1), 112 Stat. 869, 870 (1998) (codified at 42 U.S.C. § 1862k(b)(1)). And in 2017, Congress directed the NSF Director to "continue to support programs designed to broaden participation of underrepresented populations in STEM fields" and "award grants on a competitive, merit-reviewed basis, to eligible entities to increase the participation of underrepresented populations in STEM fields, including individuals identified in [42 U.S.C. §§ 1885a and 1885b]." American Innovation and Competitiveness Act, Pub. L. No. 114-329, § 305, 130 Stat. 2969, 3007 (2017) (codified as amended at 42 U.S.C. § 1862s-5). NSF implements these congressional mandates through grant programs that assess proposals for intellectual merit and broader impacts. Historically, NSF has awarded grants through an apolitical merit review process, in which panels of independent expert scientists, engineers, and education professionals vet grant applications and make award decisions.

3. For years, the CSU System has partnered with NSF to support the agency's statutory mission by conducting research, training students, preparing teachers, and contributing to California's and the nation's workforce and economic vitality. As the nation's largest four-year public university system, CSU institutions conduct applied and basic research in fields including public health, engineering, computer science, energy infrastructure, agricultural sustainability, and science education. CSU's research enterprise is deeply connected to instruction and professional training for students who will enter California's and the United States' scientific, educational, and technical workforce. NSF awards to CSU support long-term work that cannot be meaningfully conducted through intermittent, uncertain, or politically contingent funding, which is as Congress intended.

4. Plaintiffs' research grants were awarded following NSF's merit-based, competitive review system and aligned fully with NSF's statutory purposes as mandated by Congress. Dr. Visintainer's award supported research and curriculum development promoting community-based climate science education for middle and high school science teachers and students. Dr. Navarro's award supported research concerning bilingual science and engineering teacher preparation to improve bilingual teacher retention and Latiné student participation in science and engineering. Dr. Garbesi's award supported a science-grounded climate-education initiative in low-income public schools. Each Plaintiff's project was designed as a multi-year undertaking, requiring sustained

collaboration among university researchers, graduate students, educators, community partners, and participating schools. Each depended upon the reasonable expectation that, absent noncompliance, misconduct, or another lawful basis for termination, the project could proceed through its approved period of performance.

5. In October 2024, Senator Ted Cruz issued an unprecedented and remarkable attack on NSF grantees' academic free speech, identifying what he called "extreme [grant] proposals" that "were headed by principal investigators who also push radical perspectives through on-campus activism and in their classrooms."[1] The grants targeted in the Cruz Report were identified through viewpoint-driven keyword screening. The Cruz Report flagged grants containing words such as "equity," "inclusion," "diversity," "climate justice," and "underrepresented," and treated the resulting classifications as evidence of ideological defect across programs. Echoing McCarthy-era attacks on academic institutions and scholars, the Cruz Report claimed that Plaintiffs' grants "mask Marxist social ideology" that "pushed onto science neo-Marxist perspectives about enduring class struggle."[2]

6. Following President Donald J. Trump's inauguration in 2025, Defendants used the Cruz Report to implement his Executive Orders directing agencies to terminate or review grants associated with concepts such as diversity, equity, inclusion, environmental justice, and gender identity. In particular, Executive Order No. 14151 directed agency officials to terminate, to the maximum extent permitted by law, equity-related grants and contracts. Executive Order No. 14173 directed agencies to remove references to diversity, equity, and inclusion ("DEI") from federal grants and financial-assistance procedures and to terminate related programs and activities.

[1] Minority Staff of S. Comm. on Com., Sci., & Transp., 118th Cong., *D.E.I. Division. Extremism. Ideology. How the Biden-Harris NSF Politicized Science* 15 (Oct. 2024), https://www.commerce.senate.gov/wp-content/uploads/media/doc/NSF%20Politicized%20Funding_FINAL.pdf [https://perma.cc/UE2K-ZTSQ] ("Cruz Report").

[2] *Id.* at 2, 6; *see also* Press Release, U.S. Senate Comm. on Com., Sci., & Transp., *New Cruz Investigation Reveals How Biden-Harris Diverted Billions from Scientific Research to DEI Activists* (Oct. 9, 2024), https://www.commerce.senate.gov/press/rep/release/new-cruz-investigation-reveals-how-biden-harris-diverted-billions-from-scientific-research-to-dei-activists-2024-10/ [https://perma.cc/X4DK-U63G] ("Cruz Press Release").

Defendants obtained and adopted the Cruz Report's keyword screening methodology and database of purportedly problematic NSF grants, and set about punishing the grantees for their academic speech by terminating their grant funding.

7. Neither the Cruz Report nor NSF made any effort to evaluate whether any targeted project was scientifically sound, peer-reviewed, compliant, or valuable to the scientific community. Nor did NSF or the Cruz Report address Congress's statutory mandates to NSF, including Congress's direction that NSF broaden STEM participation and develop intellectual capital among groups historically excluded from science, mathematics, and engineering. Instead, NSF and the Cruz Report transformed compliance with NSF's statutory mandate into a basis for punitive grant termination.

8. NSF summarily terminated Plaintiffs' grants with the same or substantially identical form termination notices, stating only that their awards no longer aligned with "current NSF priorities" or no longer effectuated "program goals or agency priorities." NSF never provided any grant-specific explanation, never identified any performance deficiency or violation of grant conditions, and simply declared the decisions final and not subject to appeal. NSF's subsequent responses confirmed that it did not allege any deficiency by the awardees and relied solely on its implementation of the Executive Orders.

9. NSF has admitted that "[w]hen identifying grants for termination, NSF selected those that expressed, or were presumed to express, viewpoints disfavored by the Administration, as set forth in Executive Orders or NSF's executive directives, because NSF no longer wished to subsidize those grants' viewpoints, or presumed viewpoints, such as the subject and/or topic of the grant." *Thakur v. Trump*, No. 3:25-cv-04737-RFL, ECF No. 211-5, Ex. E(1) § II, ¶ 5, at 5–6 (N.D. Cal. July 15, 2026).

10. These terminations were textbook First Amendment violations. Just as New Hampshire and New York officials could not require university professors to certify that they were not or had never been Communists, *Sweezy v. New Hampshire ex rel. Wyman*, 354 U.S. 234, 250 (1957) (plurality opinion); *Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 609–10 (1967), Defendants may not punish NSF grantees for supposedly "neo-Marxist" views. "[T]he

government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression. . . . When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995) (citations omitted). Defendants' actions also were in direct contradiction of NSF's statutory mandate and accordingly violate the Spending Clause of the Constitution, violate the APA and were *ultra vires*.

11. The terminations inflicted immediate and concrete harm. They halted ongoing research midstream; forced Plaintiffs to cease project activities and expenditures without an orderly wind-down; prevented completion of data collection, analysis, publication, and dissemination; impaired relationships with participating schools, educators, community organizations, advisory boards, students, and research collaborators; and withdrew promised funding on which Plaintiffs had relied.

12. The terminations also damaged Plaintiffs' careers and professional standing. Dr. Visintainer's CAREER award, NSF's most prestigious award designed to launch the research program trajectories of pre-tenure faculty, was terminated mid-project; Dr. Navarro's first federal award as a Co-Principal Investigator was terminated before the project could be launched as planned; and Dr. Garbesi lost her university employment following termination of her award. The resulting disruptions have impaired research trajectories, professional opportunities, scholarly output, and the careers of researchers whose work depended on these projects.

13. The terminations further injured the public. The affected projects were not abstract exercises. They were designed to improve STEM education, train and retain teachers, expand educational opportunity, develop climate-science learning, and generate knowledge that would benefit students, schools, communities, and the scientific field. Abruptly ending these projects after substantial public investment wastes completed work, prevents the realization of anticipated public benefits, and undermines the trust required for sustained university-community research partnerships.

14. Plaintiffs do not seek to prevent NSF from administering lawful grant programs with differing priorities, evaluating research proposals under congressionally authorized standards, or

terminating grants for legally sufficient, grant-specific reasons. Rather, Plaintiffs seek to require NSF to exercise that discretion in accordance with Congress's directives and the Constitution, and to prevent the agency from using federal research funding as a weapon to penalize disfavored viewpoints or suppress academic inquiry in an unlawful and fundamentally un-American manner.

## II. JURISDICTION, VENUE, DIVISIONAL ASSIGNMENT, AND STANDING

### A. Jurisdiction

15. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the United States Constitution. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 705–06.

### B. Venue

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are officers and agencies of the United States served in their official capacities, no real property is at issue in this case, and many Plaintiffs and members of the Proposed Class are citizens of California and are residents of this District, where many of the federal grant terminations that are the subject of this suit, and the resulting harms to Plaintiffs and the Class, have occurred and will continue to occur unless enjoined.

### C. Divisional Assignment

17. Assignment to the San Jose Division is proper under Civil L.R. 3-2(c) and (e) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Santa Clara County. Plaintiff Visintainer is a member of the faculty at San José State University in San Jose, California; NSF directed the termination of her CAREER grant to SJSU, which received the termination notice on April 18, 2025; and her research program, community partnerships, and resulting injuries are centered there. Members of the proposed Class at SJSU have suffered similar terminations and harm.

**D. Standing**

18. Plaintiffs have standing to sue. NSF identified, flagged, and terminated the specific research awards for Plaintiffs' projects, and Plaintiffs' federally funded research was the target of Defendants' actions. Plaintiffs have accordingly suffered a concrete, particularized, and actual injury-in-fact that is fairly traceable to Defendants' conduct and redressable by the declaratory and injunctive relief. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

19. Plaintiffs' injuries are continuing. Plaintiffs Visintainer and Navarro and the proposed Class remain active researchers and educators in their fields, intend to seek or participate in future federally funded research, including projects funded by NSF, and now face the continuing threat that NSF will again identify their research for termination or denial based on its subject matter or the viewpoints Defendants perceive it to express. All Plaintiffs and proposed Class members also continue to suffer professional and reputational harm from having been singled out and publicly targeted by the government because of the content and viewpoint of their research.

## III. PARTIES

**A. Plaintiffs**

20. Individual Plaintiff and Class Representative Tammie Visintainer is a citizen of the United States and the State of California, and a member of the faculty at San José State University ("SJSU") who engages in research. SJSU is a CSU institution, and Dr. Visintainer is a CSU employee. She resides in the Northern District of California.

21. Individual Plaintiff and Class Representative Melissa Navarro Martell is a citizen of the United States and the State of California, and a member of the faculty at San Diego State University ("SDSU") who engages in research. SDSU is a CSU institution, and Dr. Navarro is a CSU employee. She resides in the Southern District of California.

22. Individual Plaintiff and Class Representative Karina Garbesi is a citizen of the United States and the State of California, and a Professor Emerita in the Department of Anthropology, Geography, and Environmental Studies at California State University, East Bay ("CSUEB") who engages in research. CSUEB is a CSU institution, and Dr. Garbesi was a CSU employee at all relevant times. She resides in the Northern District of California.

**B. Defendants**

23. Defendant National Science Foundation ("NSF") is a federal agency headquartered in Alexandria, Virginia. NSF is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

24. Defendant Brian Stone is Acting Director of NSF and is sued in his official capacity.

## IV. FACTUAL ALLEGATIONS

**A. Congress Requires NSF to Increase Participation by Women and Minorities in Science, Technology, Mathematics, and Engineering**

25. In 1950, Congress enacted the National Science Foundation Act (the "Act"), 42 U.S.C. § 1861 et seq., establishing NSF as an independent federal agency to promote scientific progress, advance the nation's health, prosperity, and welfare, and secure the national defense. Congress authorized and directed NSF to support basic scientific research and education through grants, scholarships, and fellowships, expressly identifying "independent research by individuals" as part of the scientific enterprise the agency was created to strengthen. National Science Foundation Act of 1950, Pub. L. No. 81-507, §§ 2–3, 64 Stat. 149, 149–150 (1950).

26. The Act followed years of legislative consideration informed by the nation's wartime scientific experience and Vannevar Bush's 1945 report, *Science—The Endless Frontier*, which advocated sustained federal support for basic research at colleges, universities, and research institutions as essential to the nation's prosperity and security.

27. NSF's statutorily defined mission "is to provide Federal support for basic scientific and engineering research, and to be a primary contributor to mathematics, science, and engineering education at academic institutions in the United States." 42 U.S.C. § 1862k(a)(6)(A). NSF awards limited-term grants in response to specific proposals from researchers and research organizations through a merit review process in which scientific, engineering, and education experts evaluate applications for "intellectual merit" as well as "broader impacts." NSF considers those evaluations, along with other programmatic factors, in making award decisions.

28. Since at least 1980, Congress has recognized the national interest in encouraging and preparing people from groups traditionally underrepresented in STEM to acquire skills and pursue

careers in science and engineering. Congress consequently prescribed a national policy to promote the "full use of the human resources of the Nation" in STEM fields:

> The Congress declares it is the policy of the United States to encourage ***men and women, equally, of all ethnic, racial, and economic backgrounds*** to acquire skills in science, engineering, and mathematics, to have equal opportunity in education, training, and employment in scientific and engineering fields, and thereby to promote scientific and engineering literacy and the full use of the human resources of the Nation in science and engineering.

Science and Technology Equal Opportunities Act, Pub. L. No. 96-516, § 32(b), 94 Stat. 3007, 3011 (1980) (codified as amended at 42 U.S.C. § 1885(b) (emphasis added). Congress further declared that "the highest quality science and engineering over the long-term requires substantial support, from currently available research and educational funds, for ***increased participation in science and engineering by women and minorities***." *Id.* (emphasis added).

29. In 1998, Congress reaffirmed NSF's commitment to making the United States a leader in STEM fields. The National Science Foundation Authorization Act of 1998 identified long-term goals of maintaining world leadership in science, mathematics, engineering, and technology; promoting the discovery, integration, dissemination, and application of new knowledge in service to society; and achieving excellence in STEM education at all levels. National Science Foundation Authorization Act of 1998, Pub. L. No. 105-207, § 101(a)(6)(B), 112 Stat. 869, 870 (1998) (codified at 42 U.S.C. § 1862k(a)(6)(B)).

30. Congress further prescribed "core strategies" that NSF "shall use" to achieve the statutory long-term goals. Congress directed NSF to "[d]evelop intellectual capital, both people and ideas, ***with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering***." *Id.* § 101(b)(1), 112 Stat. at 870 (codified at 42 U.S.C. § 1862k(b)(1)) (emphasis added). Congress thus expressly required NSF to fund expansion of STEM access to underserved communities.

31. Congress further directed that NSF "shall continue to support programs designed to broaden participation of underrepresented populations in STEM fields," and specifically "shall award grants . . . to increase the participation of underrepresented populations in STEM fields, including individuals identified in [42 U.S.C. §§ 1885a and 1885b]." 42 U.S.C. § 1862s-5(c), (d)(1).

Those subsections refer to increasing participation of "women," "minorities," and "persons with disabilities" in STEM. *Id.* §§ 1885a, 1885b. These directives reflected Congress's findings that "underrepresented populations are the largest untapped STEM talent pools in the United States," and that "the United States should encourage full participation of individuals from underrepresented populations in STEM fields." *Id.* § 1862s-5(b)(3), (4); *see also id.* § 1885(b).

32. NSF has succeeded in fueling scientific advancement, and its grants are counted among the most prestigious and competitive. NSF-funded research has contributed to some of the most important scientific and technological developments of the modern era, including the Internet, semiconductor chips, supercomputers, 3-D printing, deep ocean exploration and drilling, fusion energy, kidney matching, LASIK eye surgery, magnetic resonance imaging (MRI), and seeing black holes. The enormous impact of the NSF grant-making process is summarized neatly in this statement from Forbes:

> For 75 years, the National Science Foundation has been the quiet backbone of American scientific progress. It funds a substantial share of all federally supported basic research outside the biomedical sphere, supporting discoveries in climate science, artificial intelligence, cybersecurity and quantum materials among many, many others. Its grants train graduate students, launch early-career faculty and sustain the open, reproducible research that fuels U.S. competitiveness.[3]

Moreover, much of the NSF-funded research at universities has encouraged participation in STEM fields by women, minorities, and people with disabilities, consistent with NSF's specific and unambiguous statutory directives.

### B. The CSU System Uses Federal Funding to Make Vital Contributions to Applied Research and Workforce Development to Benefit the Public

33. The CSU System is the nation's largest four-year public university system. Comprised of 22 campuses across the state, the CSU System has made and continues to make vital, far-reaching contributions to applied and basic scientific research that directly enhance the workforce, economic vitality, and public welfare of California and the United States.

[3] John Drake, *The NSF Is Being Dismantled — With Broad Implications for the American Economy*, Forbes (May 9, 2025), https://www.forbes.com/sites/johndrake/2025/05/09/the-national-science-foundation-is-being-dismantled-what-the-economy-needs-is-more-investment/.

34. The CSU System serves as an indispensable national engine for scientific inquiry and community-engaged discovery. CSU research initiatives are uniquely positioned to tackle some of the nation's and California's most urgent regional and global challenges, delivering globally cited science and transformative innovations in fields ranging from public health and engineering to computer science, energy infrastructure, and agricultural sustainability.

35. In the scientific and technological realms, CSU-led research has driven critical breakthroughs, including the development of pioneering, culturally responsive computer science curricula to retain marginalized students, the identification and evaluation of deep-space monitoring locations for cosmic exploration, innovative material science methodologies to optimize earth-abundant materials for clean energy, and public health frameworks designed to strengthen and diversify the nation's biomedical workforce.

36. Through its robust research enterprise and the specialized training it provides, the CSU System serves as an unparalleled economic catalyst. The system graduates more than 100,000 job-ready professionals annually, powering major high-growth sectors including biotechnology, aerospace, civil infrastructure, healthcare, and professional business services. Remarkably, one out of every ten employees in the State of California is a CSU graduate.

37. NSF and the CSU System enjoy a mutually beneficial relationship: NSF grants funded across the CSU enterprise are explicitly structured to fulfill Congress's statutory mandate to expand the nation's intellectual capital by broadening STEM access, funding critical scholarships, and building research pathways for first-generation, low-income, and historically underrepresented students. 42 U.S.C. §§ 1862k(b)(1), 1862s-5, 1885. In turn, this stable, peer-reviewed federal funding source, and the diverse scientific talent it empowers, has allowed the CSU System to sustain long-term scientific progress in furtherance of NSF's statutorily mandated mission to promote scientific progress, advance the nation's health, prosperity, and welfare, and secure the national defense.

38. Because the very nature of research projects requires multi-year, predictable funding cycles, the CSU System has historically operated its research programs with an expectation of ordered processes insulated from sudden, viewpoint-based grant terminations. This critical research

is executed by world-class faculty members, principal investigators, and dedicated research staff across the CSU campuses whose careers, tenure, and professional standing are directly tied to the viability of their federally funded portfolios. Moreover, because CSU research is deeply integrated with student instruction, viewpoint-based grant terminations imminently derail the livelihood, training, and career trajectories of young scholars who rely on these federal awards to transition from the classroom into the modern American scientific and educational workforce.

39. The scientific breakthroughs and educational pipelines described above are the direct product of this successful, apolitical partnership between the CSU System and the federal government. This partnership is shattered when previously approved federal grants are abruptly and unlawfully terminated or frozen mid-project at the direction of the executive branch.

### C. Senator Ted Cruz Initiates Viewpoint-Based Criticism of NSF Grants That is Subsequently Adopted by DOGE

40. In October 2024, on the cusp of the presidential election, Senator Cruz—then a candidate for re-election and ranking member (now chair) of the Senate Commerce, Science, and Transportation Committee—released an investigative report titled "D.E.I.: Division. Extremism. Ideology. How the Biden-Harris NSF Politicized Science" ("the Cruz Report").[4] The report is overtly viewpoint-based and criticizes funding based on particular ideologies:

> American university campuses have become saturated with DEI initiatives and courses that use neo-Marxist theories to code individuals as members of an "oppressed" or "oppressor" class based on the color of their skin, heritage, or political perspectives. In Marxist theory, the "oppressor" is typically the class or group that holds economic, political, and social power over others, while the "oppressed" are defined as those who must support the oppressors—through their labor or service—to survive.[5]

41. The Cruz Report purported to identify more than 3,400 NSF grants that Senator Cruz characterized as misusing federal funds for "woke activists" rather than legitimate scientific research.[6]

---

[4] Cruz Report, *supra* note 1.

[5] *Id*. at 7.

[6] Kathryn Palmer, *The NSF's Higher Ed Research "Hit List"*, Inside Higher Ed (Feb. 26, 2025), https://www.insidehighered.com/news/government/science-research-policy/2025/02/26/nsfs-higher-ed-research-hit-list.

42. The Cruz Report's so-called "Data and Analytics Methodology" was explicitly viewpoint-based. Appendix B listed five sets of "keywords and phrases" supposedly related to categories of DEI efforts: "status," "social justice," "gender," "race" and "environmental justice." Appendix A to the Cruz Report describes the authors' purported methodology as accessing the USAspending.gov database to capture all reported NSF grants active between January 20, 2021, and April 4, 2024, downloading the project descriptions of the grants, and "tagg[ing] grants with the specific keywords."[7]

43. In sum, Senator Cruz targeted "ideological" grants based on a list of approximately 700 words and phrases that he and his colleagues believed revealed "neo-Marxist," "social justice," and "left-wing social activis[t]" ideas.[8] At no point did the Cruz Report assess whether any individual flagged grant was scientifically sound, peer-reviewed, innovative, or producing results of value to the scientific community. The screening process was, on its face, a viewpoint-based classification system: grants were labeled ideological because they contained words the Report's authors associated with disfavored viewpoints—a textbook example of circular reasoning.

44. The Cruz Report referred to the recipients of NSF funding as "Ideologically Radical Researchers" and targeted their classroom teaching and campus activities—the very crux of academic freedom: "Many of the most extreme proposals were headed by principal investigators who ***also push radical perspectives through on-campus activism and in their classrooms***."[9] Indeed, the Cruz Report specifically attacked Plaintiff Visintainer for purportedly "see[ing] her classroom as a venue for social activism."[10]

---

[7] Cruz Report, *supra* note 1, at 38.

[8] *Id.* at 2.

[9] *Id.* at 15 (emphasis added). Senator Cruz's attacks are strikingly similar to the so-called Feinberg Certificate implemented by the New York State Board of Regents and declared unconstitutional by the Supreme Court. The 1956 Feinberg Certificate required personnel of any New York state college or other institution of higher education to declare "that he was not a member of the Communist Party, and that if he had ever been a member he had communicated that fact to the President of the State University." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 596 (1967).

[10] Cruz Report, *supra* note 1, at 31.

45. The Cruz Report materials included a searchable database of flagged grants, which Senator Cruz released publicly in February 2025 after President Trump's inauguration.[11]

**D. Defendants Terminate the NSF Grants Identified in the Cruz Report Based on Viewpoint Discrimination**

46. Beginning on Inauguration Day (January 20, 2025), President Trump immediately issued a series of Executive Orders targeting disfavored ideas or policies and directing federal agencies to terminate federal funding for projects perceived to promote those disfavored ideas or policies. In Executive Order No. 14151, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing," President Trump instructed the U.S. Attorney General and others to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." Additionally, it directs each federal agency head to "terminate, to the maximum extent allowed by law . . . all 'equity-related' grants or contracts" within 60 days.[12]

47. In Executive Order No. 14173, President Trump complained about "dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility (DEIA)[.]'" The Executive Order requires the Director of the Office of Management and Budget ("OMB") to, among other things:

---

[11] U.S. Senate Comm. on Com., Sci., & Transp., *Public Database Release (1) (1)* (Feb. 11, 2025), https://www.commerce.senate.gov/index.cfm?a=files.serve&File_id=94060590-F32F-4944-8810-300E6766B1D6 (last visited Oct. 22, 2026); *see also* Press Release, U.S. Senate Comm. on Com., Sci., & Transp., *Cruz-Led Investigation Uncovers $2 Billion in Woke DEI Grants at NSF, Releases Full Database* (Feb. 11, 2025), https://www.commerce.senate.gov/press/rep/release/cruz-led-investigation-uncovers-2-billion-in-woke-dei-grants-at-nsf-releases-full-database-2025-2/ [https://perma.cc/RNM4-BRUK].

[12] Exec. Order No. 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing, 90 Fed. Reg. 8339 (Jan. 29, 2025), https://www.federalregister.gov/documents/2025/01/29/2025-01953/ending-radical-andwasteful-government-dei-programs-and-preferencing.

- "Excise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures," and
- "Terminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate."[13]

48. President Trump also issued Executive Order No. 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," which directed that "[f]ederal funds shall not be used to promote gender ideology," instructed federal agencies to revise grant conditions accordingly, and defined "gender ideology" as a "false claim" that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity," and that "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex."[14]

49. Moreover, to enforce his personal ideological agenda, President Trump signed Executive Order No. 14158, "Establishing and Implementing the President's 'Department of Government Efficiency,'" commonly known as "DOGE." The Executive Order required the head of each federal agency to establish a team of at least four DOGE employees within their agency.[15]

50. On February 26, 2025, President Trump issued Executive Order No. 14222, "Implementing the President's 'Department of Government Efficiency' Cost Efficiency

---

[13] Exec. Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg. 8633 (Jan. 31, 2025), https://www.federalregister.gov/documents/2025/01/31/2025-02097/ending-illegaldiscrimination-and-restoring-merit-based-opportunity.

[14] Exec. Order No. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan. 30, 2025), https://www.federalregister.gov/documents/2025/01/30/2025-02090/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal.

[15] Exec. Order No. 14158, Establishing and Implementing the President's "Department of Government Efficiency", 90 Fed. Reg. 8441 (Jan. 29, 2025), https://www.federalregister.gov/documents/2025/01/29/2025-02005/establishing-and-implementing-the-presidents-department-of-government-efficiency.

Initiative."[16] Notwithstanding that the Constitution allocates spending power to Congress alone, the Order purported to begin the Executive's "transformation in Federal spending on contracts, grants, and loans." This Order required federal agencies to review all existing grants with an eye toward termination.

51. In accordance with these Executive Orders, Defendants executed a series of actions to terminate the NSF grants identified in the Cruz Report, based on Defendants' disagreements with academic viewpoints expressed in the grant descriptions and academic speech of the grants' principal investigators.

52. On or about April 18, 2025, then-NSF Director Sethuraman Panchanathan adopted and circulated a memorandum memorializing a "shift in agency priorities" ("the April 18 Memorandum"). The April 18 Memorandum was a high-level final agency decision implementing the President's Executive Orders for NSF.

53. Also on April 18, 2025, NSF published a "Statement of NSF Priorities" explaining that NSF's activities "must aim to create opportunities for all Americans everywhere" and that "[r]esearch projects with more narrow impact limited to subgroups of people based on protected class or characteristics do not effectuate NSF priorities."[17]

54. Adopting the language and goals of the Cruz Report, NSF also issued an accompanying set of FAQs, which indicated that awards not aligned with NSF priorities had been terminated, including but "not limited to those on diversity, equity, and inclusion (DEI) and misinformation/disinformation."[18] The FAQs also state that "[p]rojects that have limited impact or rely on DEI frameworks or advocacy do not effectuate NSF priorities."

---

[16] Exec. Order No. 14222, Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative, 90 Fed. Reg. 11095 (Mar. 3, 2025), https://www.federalregister.gov/documents/2025/03/03/2025-03527/implementing-the-presidents-department-of-government-efficiency-cost-efficiency-initiative.

[17] U.S. Nat'l Sci. Found., *Statement on NSF Priorities* (Apr. 18, 2025), https://www.nsf.gov/updates-on-priorities#statement-of-nsf-priorities-09d [https://perma.cc/UH6L-EZFC].

[18] U.S. Nat'l Sci. Found., *Update on NSF Priorities* (July 30, 2025), https://www.nsf.gov/updates-on-priorities [https://perma.cc/D79S-LZ34].

55. Pursuant to the April 18 Memorandum, DOGE and NSF proceeded to terminate NSF grants based on certain keywords and information from the Cruz Report.[19] In mid-April 2025, NSF terminated over 430 grants in one week.20

56. NSF informed Plaintiffs and other grant recipients of the terminations via email. These termination notices were perfunctory and identical, save for individual award identification numbers:

> The U.S. National Science Foundation (NSF) has undertaken a review of its award portfolio. Each award was carefully and individually reviewed, and the agency has determined that termination of certain awards is necessary ***because they are not in alignment with current NSF priorities***.
>
> Effective immediately, the following are terminated: NSF Award Id [individual award numbers].
>
> NSF is issuing this termination to protect the interests of the government pursuant to NSF Grant General Conditions (GC-1) term and condition entitled "Termination and Enforcement," ***on the basis that they no longer effectuate the program goals or agency priorities***. This is the final agency decision and not subject to appeal.

(emphasis added).

57. A letter from the House of Representatives' Committee on Science, Space, and Technology sent to the Acting Director of NSF, Defendant Brian Stone, on May 8, 2025 states that "[DOGE's] accusation that these terminated awards lack merit is a lie, as most, if not all these awards, carry a statement from the agency declaring that '[the] award reflects NSF's statutory mission and has been deemed worthy of support through evaluation using the Foundation's intellectual merit and broader impacts review criteria.'"[21]

---

[19] Jeffrey Mervis, *In killing grants, NSF appears to follow Ted Cruz's blueprint*, Science Magazine, https://www.science.org/content/article/killing-grants-nsf-appears-follow-ted-cruz-s-blueprint (last visited July 7, 2026) ("Sources tell *Science* that NSF's actions were driven by a report issued last fall by Senator Ted Cruz (R–TX), chair of a committee that oversees NSF and other science agencies.").

[20] Erin Socha, *New Database Tracks Canceled N.S.F. Research Grants*, U. Daily Kansan (Apr. 25, 2025), https://www.kansan.com/news/new-database-tracks-canceled-n-s-f-research-grants/article_0a3d2a6c-97e5-43c3-96c0-db02dc609210.html.

[21] Letter from House of Representatives' Committee on Science, Space and Technology to Brian Stone (May 8, 2025), https://democrats-science.house.gov/imo/media/doc/2025-05-08%20Letter%20to%20Acting%20Director%20Stone.pdf [https://perma.cc/9YFG-GQCG].

58. The House Committee Letter goes on to state: "The cancelation of these awards suggests instead that NSF is willing to apply political censorship of awards under direction from President Trump and the DOGE teenagers, which is a clear violation of the statutory mission of the agency."[22]

59. Indeed, by its own damning admission, NSF engaged in viewpoint discrimination in determining which grants to terminate. NSF is a named defendant in a lawsuit challenging the DOGE-instigated terminations of federal grants to the University of California, *Thakur v. Trump*, No. 3:25-cv-04737-RFL (N.D. Cal.) ("the *Thakur* Litigation"). There, through its Chief of Staff (Acting) and Chief of Research Security, Strategy, and Policy Rebecca Keiser, NSF admitted in a stipulation that it had based its grant terminations on the Trump Administration's disapproval of specific viewpoints:

> 1. NSF acted pursuant to Executive Orders or executive directives, meaning an agency memorandum, or other formal written articulation of agency priorities, when reviewing grants for termination.
>
> . . . .
>
> 5. When identifying grants for termination, ***NSF selected those that expressed, or were presumed to express, viewpoints disfavored by the Administration***, as set forth in Executive Orders or NSF's executive directives, because NSF no longer wished to subsidize those grants' viewpoints, or presumed viewpoints, such as the subject and/or topic of the grant.
> 6. NSF accepts that the search terms, keywords, or other criteria used to determine which grants to terminate ***were designed to identify grants that expressed, or were presumed to express, viewpoints the Administration no longer wished to subsidize***
> . . . .
>
> 9. NSF identified grants for termination using general criteria, rather than a grant-specific assessment of each award's compliance, or performance.
>
> . . . .
>
> 12. NSF's enabling statute or other legislation includes grant-making as a directive from Congress to NSF.
>
> 13. NSF did not terminate any grants based on alleged noncompliance with the terms of the grant.[23]

---

[22] *Id.*

[23] *Thakur v. Trump*, No. 3:25-cv-04737-RFL, ECF No. 211-5, Ex. E(1) § II, ¶¶ 1, 5–6, 9, 12–13, at 6–7 (N.D. Cal. July 15, 2026).

NSF further admitted that in using search terms, keywords, or phrases to identify and terminate grants with disfavored viewpoints, it relied on "search terms, keywords, or phrases" identified by Senator Ted Cruz in his 2024 report and his database of NSF grants.[24]

60. NSF personnel have acknowledged in other contexts that grant terminations were based on "keyword searches and analytics" targeting terms such as "equity," "diversity," "inclusion," and "justice," and that NSF officials terminated grants using these criteria at the personal direction of DOGE operatives.[25]

61. According to data posted by DOGE, NSF has terminated over $9.4 million[26] in over 30 grants to the CSU System based on this viewpoint discrimination. The harm to CSU researchers cannot be overstated.

### E. NSF's Illegal Grant Terminations Harmed Dr. Visintainer and Other Grant Recipients

62. For years, Plaintiffs and other CSU researchers have relied on NSF grants to fund meritorious projects aimed at advancing scientific knowledge and promoting participation in STEM fields. The termination of previously approved grants has caused and continues to cause Plaintiffs and other CSU researchers serious harm.

#### 1. Plaintiff Tammie Visintainer's Grant Termination and Resulting Harm

63. Dr. Tammie Visintainer is a Professor in the Department of Teacher Education at San José State University ("SJSU"). She holds a B.S. in Zoology from the University of Wisconsin-

---

[24] *Id.* at 10.

[25] *See* Dan Garisto, *Trump Team Freezes New NSF Awards – And Could Soon Axe Hundreds of Grants*, Nature (Apr. 17, 2025), https://www.nature.com/articles/d41586-025-01263-0 [https://perma.cc/4AEL-93Q4] ("All new research grants have been frozen at the US National Science Foundation (NSF) — an action apparently ordered by the Department of Government Efficiency (DOGE) . . . DOGE is also reviewing a list of active research grants, assessed in February by the NSF, for terms associated with diversity, equity and inclusion (DEI). It is considering terminating more than 200 of them, NSF staff members have told Nature.").

[26] This number was produced by searching DOGE data posted at https://api.doge.gov/docs, which is accessible through DOGE's "Wall of Receipts" at https://doge.gov/savings. The $9.4 million was determined by looking at "Savings" under the "Grants" category, for entries in which CSU System institutions were listed as recipients of NSF grants.

Madison, an M.S. in Marine Science from San Francisco State University, and a Ph.D. in Education in Mathematics, Science, and Technology from the University of California, Berkeley.

64. Dr. Visintainer conducts research on science education, with particular focus on preparing middle and high school science teachers and developing community-based science learning frameworks that increase access to quality science education. Her research focuses on: (1) science education pedagogy and teacher preparation; (2) developing science curricula and instructional frameworks; and (3) engaging students—particularly those from historically underrepresented communities—in science learning. Her work directly advances NSF's congressionally mandated mission to support STEM research and education and to develop "the full use of the human resources of the Nation in science and engineering," including by ensuring that "men and women, equally, of all ethnic, racial, and economic backgrounds" have equal opportunity in STEM fields. National Science Foundation Act of 1950, Pub. L. No. 81-507, 64 Stat. 149, 149; 42 U.S.C. §§ 1862, 1885(b).

65. Multiple NSF grants have supported Dr. Visintainer's research over her career, reflecting the merit and importance of her work to the scientific community and to the nation's educational infrastructure.

***i. NSF CAREER Grant Application and Award***

66. In July 2021, Dr. Visintainer submitted a grant application for an NSF Faculty Early Career Development Program (CAREER) grant—the most prestigious grant NSF offers to early-career faculty. The CAREER program "supports early-career faculty who have the potential to serve as academic role models in research and education and to lead advances in the mission of their department or organization,"[27] and CAREER grants are widely recognized as a critical milestone for establishing a successful academic career in STEM fields.

67. Dr. Visintainer was listed as the Principal Investigator ("PI") on the grant proposal, titled "Transforming Science Teaching and Learning in School: Empowering Teachers and Students

---

[27] U.S. Nat'l Sci. Found., Faculty Early Career Development Program (CAREER), https://www.nsf.gov/funding/opportunities/career-faculty-early-career-development-program (last visited Oct. 14, 2026) [https://perma.cc/43AY-258M].

as Climate Justice Action Researchers and Change Agents." The proposal addressed how to prepare middle/high school science teachers as curricular designers who support students as community-based climate scientists that investigate local issues of heat. The goal was to support the next generation of science innovators and problem solvers, in direct alignment with NSF's congressionally mandated goal of "[d]eveloping an American STEM workforce that is globally competitive through improved pre-kindergarten through grade 12 STEM education and teacher development, and improved undergraduate STEM education and instruction." 42 U.S.C. § 1862p-14(a)(5); *see also* 42 U.S.C. § 1862k.

68. Dr. Visintainer's grant application requested funding commensurate with a five-year budget to support this multi-year research and curriculum-development project. Her application successfully navigated and satisfied NSF's rigorous peer-review process involving the approval of independent expert scientists who assessed the proposal for both "intellectual merit" and "broader impacts."

69. NSF awarded the CAREER grant to Dr. Visintainer on March 8, 2022, authorizing the proposal for a project period spanning five years, from March 15, 2022 through February 28, 2027 (Award No. 2148014). The Award Notice states that the total intended award amount was $786,285. The Notice of Award obligated an initial amount of $222,957 for the first budget period. The Award Notice further provided: "Contingent on the availability of funds and scientific progress of the project, NSF expects to continue support at approximately the following level: Fiscal Year 2024, Increment Amount: $178,787; Fiscal Year 2025, Increment Amount: $208,287; Fiscal Year 2026, Increment Amount: $176,254." The award committed substantial federal funding to support Dr. Visintainer's salary, graduate student researchers, curriculum development, community partnerships, and dissemination of findings. The delay between the July 2021 application deadline and the March 2022 award reflects the extensive time required for NSF's multi-stage peer-review process, including initial review by scientific review groups (study sections), secondary review by advisory councils, and final programmatic and administrative approval—a timeline that is common for highly competitive CAREER awards and does not reflect any deficiency in the proposal.

70. Dr. Visintainer's CAREER grant was not an isolated award. She was also the Co-Principal Investigator ("Co-PI") on another NSF-funded project for undergraduate STEM education entitled "Transforming Undergraduate Teaching and Learning Through Culturally Sustaining, Active, and Asset-Based Approaches to Introductory Science Courses" (Award No. 1953760). This project was awarded $1,699,833 for the period of July 2020 through June 2025. In addition, Dr. Visintainer was listed as a Co-PI on a third NSF grant project for local high school teachers to engage in engineering research with SJSU faculty and students, entitled "RET Site: Multidisciplinary Teacher Research Experience in Engineering (M-TREE)" (Award No. 2055418). This project was awarded $600,000 for the period of January 2022 to December 2025. Her role in this project was to support teachers in translating their research experiences into engineering lessons for high school students to be implemented in their classrooms. These additional grants from NSF further demonstrate the merit and importance of Dr. Visintainer's work to the scientific community.

***ii. The Ted Cruz Report and NSF Grant Targeting***

71. Government actors' viewpoint discrimination targeted Dr. Visintainer in an acutely personal way, beginning with Senator Cruz's 2024 database and report on disfavored NSF grants.

72. Dr. Visintainer's CAREER grant appeared in Senator Cruz's database of flagged awards, along with other grants to CSU institutions. Her grant was specifically identified in at least three bullets over two pages in Senator Cruz's report and associated press materials,[28] apparently because the grant title and description included the words "climate justice," "equity," "racial justice," and "diverse communities." Senator Cruz targeted Dr. Visintainer's CAREER grant at least in part because it involved educating students from racially and ethnically diverse communities—populations that NSF is congressionally mandated to prioritize under 42 U.S.C. § 1885(b) and the National Science Foundation Authorization Act of 1998.

73. Senator Cruz's investigation materials also referenced an opinion editorial (op-ed) that Dr. Visintainer had authored in April 2024, titled "Whose Life Has Value? The Role of Humanizing Dialogue in Navigating the Israeli-Hamas War." The op-ed addressed pedagogical

[28] Cruz Press Release, *supra* note 2.

approaches to and scientific literacy skills for facilitating difficult classroom conversations about the October 7, 2023 attacks and the subsequent conflict in Gaza—a topic within Dr. Visintainer's expertise in science education and teacher preparation, but wholly unrelated to the scientific content of her NSF grant. Senator Cruz also raised Dr. Visintainer's op-ed on his podcast in October 2024, ironically querying "what the hell [her op-ed] had to do with science, which is what a National Science Foundation grant is supposed to be about."[29]

74. Senator Cruz's mention of Dr. Visintainer's April 2024 op-ed in the Cruz Report and his podcast further demonstrates that the grant terminations were driven by researchers' perceived viewpoints rather than the scientific merit or compliance of their funded work. The Cruz Report and Senator Cruz's podcast highlighted the op-ed alongside Dr. Visintainer's grant, effectively treating her protected expression of opinion on a wholly unrelated public controversy as evidence that her federally funded research should be defunded. That NSF and DOGE then adopted the Cruz Report materials as a basis for identifying grants for termination confirms that the screening process targeted researchers for their perceived beliefs, not for any lack of scientific merit. The termination of Dr. Visintainer's grant on the basis of a partisan investigation's keyword searches and a researcher's unrelated public commentary is the epitome of viewpoint discrimination.

***iii. NSF Grant Termination***

75. On April 18, 2025, SJSU received the form email from NSF Grants (grants005@nsf.gov) purporting to terminate Dr. Visintainer's CAREER grant, Award No. 2148014.

76. The termination letter provided no grant-specific explanation for why Dr. Visintainer's award—which had been deemed meritorious through NSF's rigorous peer-review process, directly advanced NSF's statutory mission under 42 U.S.C. § 1885(b), and was producing significant educational outcomes—suddenly "no longer effectuate[d] the program goals or agency

---

[29] *Verdict with Ted Cruz: Follow DEI not Science, What the Law Says about Immigrant Asylum in America & Israel Erases Sinwar Week In Review*, at 5:58–7:40 (iHeartPodcasts Oct. 19, 2024), https://omny.fm/shows/verdict-with-ted-cruz-1/10-19-24-saturday [https://perma.cc/H79W-9A85].

priorities." The letter made no allegation that Dr. Visintainer had failed to comply with award terms and conditions, engaged in research misconduct, or otherwise provided cause for termination.

77. On or about May 9, 2025, the undergraduate STEM education grant for which Dr. Visintainer served as Co-PI was similarly terminated.

78. Shortly after NSF's termination of Dr. Visintainer's CAREER grant, her assigned program officer, Toya Frank, resigned from NSF. Ms. Frank told Dr. Visintainer that she could no longer ethically screen grants the way she was being asked to screen them. NSF had also terminated Ms. Frank's "Racial Equity in STEM Education" program mandate—not as a cut to a specific budget line item, but as a reduction in the broader STEM budget.

***iv. Dr. Visintainer Suffered Harm from the NSF Grant Termination***

79. Dr. Visintainer and her collaborators have suffered immediate and continuing harm as a result of the unlawful termination of her NSF CAREER grant and her participation in the collaborative NSF grant with her SJSU colleagues.

80. On April 18, 2025, Dr. Visintainer received a stop-work notice from San José State University's Office of Research, instructing her to immediately cease all project activities and refrain from incurring any new expenses on the terminated grant. The effective termination date was April 18, 2025—the same day the notice was received—providing no opportunity to wind down the project in an orderly manner or to preserve work in progress.

81. Dr. Visintainer was in the third year of her CAREER grant when it was terminated, with substantial research findings already developed and significant community partnerships already established. The abrupt termination prevented her from collecting data from teacher participants, completing data analysis, preparing manuscripts for publication, and disseminating findings to the broader educational research community.

82. The termination resulted in immediate financial harm. Dr. Visintainer was unable to pay members of her Advisory Board for work they had already performed on an hourly basis (as opposed to stipends paid in advance). These advisors—including classroom teachers, community partners, and educational researchers—had contributed expertise and time to the project with the expectation of compensation, and Dr. Visintainer was left unable to honor those commitments.

83. The termination forced graduate students working on the grant to abandon their thesis research plans. These students had designed their graduate research around data collection and analysis that the CAREER grant funded, and the termination disrupted their academic progress and professional development. The harm to these early-career researchers extends beyond the immediate project, as gaps in their publication records and incomplete thesis work will impair their competitiveness in the academic job market. The termination forced Dr. Visintainer to seek alternative funding sources to maintain even minimal project activity. She secured a short-term grant from the Spencer Foundation and limited funding from SJSU, but these emergency measures provided only temporary support that ended in July 2026. The replacement funding is a small fraction of the original NSF award and does not permit completion of the full scope of work originally planned.

84. The premature termination has severely damaged Dr. Visintainer's professional reputation and standing in the science education research community. The CAREER grant is NSF's most prestigious award for early-career faculty, and receipt of a CAREER award is widely understood as a marker of exceptional research promise and potential for leadership in one's field. Termination of a CAREER grant—particularly a termination not based on any alleged deficiency in performance or compliance—sends a signal to the research community that the recipient's work is no longer valued or aligned with federal priorities, regardless of its scientific merit. To this day, the NSF website listing for Dr. Visintainer's grant denotes in bold, yellow highlighted font that it was administratively terminated.[30]

85. Dr. Visintainer has also suffered reputational harm from the public association of her grant with Senator Cruz's investigation materials, which characterized NSF-funded research on DEI as wasteful spending on "woke activists" rather than legitimate science. Although her research directly advances NSF's congressionally mandated mission to promote participation of underrepresented groups in STEM, the public framing of her grant as an example of misused

---

[30] U.S. Nat'l Sci. Found., Award Details: Award Abstract # 2148014, https://www.nsf.gov/awardsearch/show-award?AWD_ID=2148014 (last visited Oct. 14, 2026) [https://perma.cc/MJ3H-F3LZ].

taxpayer funds has subjected her to scrutiny and criticism disconnected from the actual merit of her work.

86. The termination has also harmed Dr. Visintainer's ability to build and maintain the community partnerships that are essential to her research model. Her work in science education depends on collaboration with K-12 teachers, school administrators, and school district partnerships that serve students from low-income communities and communities of color. The abrupt cancellation of a long-term federally funded project undermines the trust necessary for these partnerships, as community partners reasonably question whether future collaborative commitments will be honored.

87. Even if Dr. Visintainer were eventually able to secure replacement funding for this project—a difficult and uncertain prospect given the substantial sums at stake and the specialized nature of CAREER grant support—the delay and disruption have caused and continue to cause irreparable harm. Data collection windows tied to academic calendars have been missed. Community partnerships have been destabilized. Graduate students have been forced to redirect their research plans. Publications that would have emerged from completed analyses have been delayed or abandoned entirely, creating gaps in Dr. Visintainer's scholarly record that will affect her career trajectory for years to come.

88. The termination dismantled a planned public student showcase at SJSU. By extinguishing this capstone event, the federal government stripped secondary students of color attending underserved schools of a vital public platform to present their evidence-based urban heat solutions to regional policymakers, chilling their academic speech and sending a damaging message regarding their potential value within the American scientific workforce, which expressly undercuts the specific congressional directives of NSF's organic statute and subsequent authorizing legislation.

89. Dr. Visintainer attempted to appeal the termination decision through SJSU's Office of Research. On August 12, 2025, NSF's Division of Grants and Agreements responded with a letter from Acting Division Director Lisa Scott-Morring, which stated:

> As indicated in your termination letter and as stated on the NSF website, terminations of awards on the basis that they no longer effectuate program goals or agency priorities are the final agency decision and are not appealable to NSF. In the case of your award, NSF does not allege a deficiency occurred (e.g., noncompliance with award terms and conditions or research misconduct of the awardee). Because there

> are no allegations of deficiencies by the awardee to dispute, there are no grounds for agency appeal. Rather, each terminated award was individually reviewed to determine consistency with and effectuation of NSF's program goals and agency priorities. Consideration of information outside of the award, itself, is not appropriate where NSF termination is based on agency determination and application of its own priorities.

90. This response confirmed that NSF terminated Dr. Visintainer's grant not because of any allegation that she failed to perform her research, violated grant terms, or engaged in misconduct, but solely because NSF unilaterally determined that her congressionally directed research on increasing STEM participation among underrepresented groups was now a "viewpoint[] disfavored by the Administration, as set forth in Executive Orders." *Thakur,* ECF No. 211-5, Ex. E(1) § II, ¶ 5–6, at 6.

91. The termination of Dr. Visintainer's NSF CAREER grant has created an ongoing chilling effect on her constitutionally protected speech and academic expression.

92. Since the termination of her grant, Dr. Visintainer has refrained from applying to NSF for any grants because her scholarly research requires the use of specific scientifically accurate and pedagogically necessary terminology and speech that NSF disfavors.

93. Dr. Visintainer's fear is objectively reasonable, as NSF itself admitted in the *Thakur* Litigation that it used search terms, keywords, and phrases to identify grants presumed to express viewpoints the administration no longer wishes to subsidize, and that it selected grants for termination based on those presumed viewpoints rather than any assessment of grant performance or compliance. Her specific public inclusion in Senator Cruz's same viewpoint-based attacks underscore the reasonableness of Dr. Visintainer's fears. *Thakur*, ECF No. 211-5, Ex. E(1) § II, ¶¶ 3(a), 5–6, 9, at 6–7.

94. The chilling effect is particularly severe because Dr. Visintainer cannot discern any clear, consistent, or non-viewpoint-based standard for what speech or research topics will be deemed acceptable under the administration's evolving and undisclosed priorities, as the termination letters provide no project-specific explanation and the government has refused to identify any performance deficiency or compliance failure. The fact that the grants are competitive only serves to strengthen the chilling effect. Plaintiffs and the putative class are on notice that work associated with the view that exclusion or unequal access warrants corrective attention will be penalized. The practical effect

is to discourage particular questions, explanatory frameworks, and educational approaches because of their presumed political meaning.

95. These harms are in addition to the loss of value to the public from Dr. Visintainer's inability to complete groundbreaking research on how access to climate justice education and action research supports learning and identity construction in science, and fosters a desire to pursue science in the future for diverse student populations—research that directly serves NSF's statutory mission and addresses a critical national need for diversifying the scientific workforce.

**2. Plaintiff Melissa Navarro Martell's Grant Termination and Resulting Harm**

96. Dr. Melissa Navarro Martell is an Associate Professor in the Department of Dual Language and English Learner Education at San Diego State University ("SDSU"). She received her Bachelor of Arts degree in Spanish Literature from the University of California, San Diego, her Master of Education degree from the University of California, Los Angeles, and her Doctor of Philosophy degree from SDSU and Claremont Graduate University. Dr. Navarro holds a California Multiple Subject Teaching Credential with Spanish bilingual authorization, and over the past two decades, she educated elementary, middle, and college-level students in English and Spanish.

97. Dr. Navarro's research focuses on bilingual science education, preparing critically conscious multilingual educators on the sociopolitical, ideological, cultural, and linguistic considerations for equitable STEM teaching, particularly in dual-language education settings. Her work includes examining collective action regarding the need to decolonize math and science education to approach it from an anti-racist perspective. Her work directly advances NSF's congressionally mandated mission to support STEM research and education and to develop "the full use of the human resources of the Nation in science and engineering," including by ensuring that "men and women, equally, of all ethnic, racial, and economic backgrounds" have equal opportunity in STEM fields. National Science Foundation Act of 1950, Pub. L. No. 81-507, 64 Stat. 149, 149; 42 U.S.C. §§ 1862, 1885(b).

***i. NSF DRK-12 Grant Application and Award***

98. In October 2022, Dr. Navarro's colleague and research collaborator in the SDSU Department of Dual Language and English Learner Education, Dr. Alberto Esquinca, submitted a

grant application to the NSF Division of Research on Learning in Formal and Informal Settings for a Discovery Research preK-12 ("DRK-12") program grant. The DRK-12 program seeks to significantly enhance the learning and teaching of STEM subjects by preK-12 students and teachers, through research and development of innovative resources, models and tools.[31] Projects in the DRK-12 program build on fundamental research in STEM education and prior research and development efforts that provide theoretical and empirical justification for proposed projects.

99. Dr. Esquinca was listed as the PI and Dr. Navarro the sole Co-PI on the grant proposal, titled "Support Partnership for New Bilingual Science and Engineering Teachers" (Award No. 2300927). The proposal aimed to examine the transition of bilingual teaching candidates entering the teaching profession as novice teachers planning and teaching bilingual science and engineering lessons. Given the isolation that many new teachers face, the project sought to position these novices as teachers of science and engineering and provide them with a network of support including peer coaching, mentorship, and a professional learning community. Drs. Esquinca and Navarro's work sought to address the problem of scarce social support at the beginning of novice bilingual teachers' careers, which could hinder their prioritization of science and engineering content, thus contributing to the historical underrepresentation of Latiné people in science and engineering. This exploratory research project was to have involved a years-long partnership between the largest bilingual teacher preparation program in California—SDSU's Department of Dual Language & English Learner Education—and local educational agencies, including California's second largest school district. This partnership had the potential for long-term benefit for not just the partners involved, but the community at large: the novice teachers would receive support and guidance as they embarked on their bilingual education career, students could more deeply engage with STEM learning, schools could improve educational results and teacher retention, and Drs. Esquinca and Navarro could obtain valuable firsthand data that would shed light on how to improve bilingual education methods for future teachers.

---

[31] U.S. Nat'l Sci. Found., Discovery Research PreK-12 (DRK-12), https://www.nsf.gov/funding/opportunities/drk-12-discovery-research-prek-12/500047/nsf23-596 (last visited Oct. 14, 2026) [https://perma.cc/5HN2-JJW8].

100. The grant application requested funding commensurate with a four-year budget to support this multi-year research project. Drs. Esquinca and Navarro's application successfully navigated and satisfied NSF's rigorous peer-review process involving the approval of independent expert scientists who assessed the proposal for both "intellectual merit" and "broader societal impact."

101. NSF awarded the DRK-12 grant to Drs. Esquinca and Navarro on August 21, 2023, authorizing the proposal for a project period spanning four years, from October 1, 2023 through September 30, 2027. The Award Notice states that the total intended and obligated award amount was $1,202,028.00. The award committed substantial federal funding to support salaries for Drs. Esquinca and Navarro, three graduate student researchers, teaching materials for the novice teachers, stipends for community partners, compensation for the project's advisory board, and dissemination of findings.

102. The delay between the October 2022 application deadline and the August 2023 award reflects the extensive time required for NSF's multi-stage peer-review process, including initial review by scientific review groups (study sections), secondary review by advisory councils, and final programmatic and administrative approval—a timeline that is common for highly competitive DRK-12 awards and does not reflect any deficiency in the proposal.

103. As a faculty member in the early stages of her career, the NSF DRK-12 grant was Dr. Navarro's first grant. At the time of submission of the grant application in October 2022, Dr. Navarro was up for tenure. She subsequently received tenure in May 2024, a year before NSF terminated the DRK-12 grant that played an influential role in SDSU's ultimate decision to grant Dr. Navarro tenure.

**ii. *NSF Grant Termination***

104. On April 25, 2025, SDSU received the form email from NSF Grants (grants005@nsf.gov) purporting to terminate Dr. Navarro's DRK-12 grant, Award No. 2300927.

105. The termination email provided no grant-specific explanation for why Dr. Navarro's award—which had been deemed meritorious through NSF's rigorous peer-review process, which directly advanced NSF's statutory mission under 42 U.S.C. § 1885(b), and which was on the way to

producing significant educational outcomes—suddenly "no longer effectuate[d] the program goals or agency priorities." The letter made no allegation that either Dr. Navarro or Dr. Esquinca had failed to comply with award terms and conditions, engaged in research misconduct, or otherwise provided cause for termination.

106. On May 1, 2025, SDSU and Dr. Navarro received an email from Elizabeth Gebremedhin (egebreme@nsf.gov), the Awarding Official for Dr. Navarro's DRK-12 grant. The email purported to amend the grant, stating that the purpose of the amendment was to "[c]hange the award end date from 09/30/2027 to 04/25/2025 . . . in accordance with the award termination notice dated 04/25/2025." Ms. Gebremedhin provided no reason for the award termination in her email.

107. The termination of Dr. Navarro's DRK-12 grant is consistent with the termination of the University of California grants in the *Thakur* Litigation and NSF's admission therein that it based its terminations on specific viewpoints. Dr. Navarro's project in substance matches key words that the Cruz Report, and hence NSF, used as a basis for attack and termination, for example focusing on "minorities." SDSU also received the substantially identical, formulaic termination letters that Plaintiff Visintainer and the *Thakur* plaintiffs received.

### iii. *Dr. Navarro Suffered Harm from the NSF Grant Termination*

108. Dr. Navarro and her collaborators have suffered immediate and continuing harm as a result of the unlawful termination of her NSF DRK-12 grant.

109. On April 25, 2025, Dr. Navarro received a stop-work notice from San Diego State University Research Foundation, instructing her to immediately cease all project activities. The effective termination date was April 25, 2025, providing no opportunity to wind down the project in an orderly manner or to preserve work in progress.

110. Dr. Navarro was in the first year of her DRK-12 grant when it was terminated, with significant community partnerships already established and memoranda of understanding signed. The abrupt termination prevented her from launching the project as it was intended, preparing manuscripts for publication, and disseminating findings to the broader educational research community. It also forced her to search for new grant opportunities on a very fast, short-term basis in order to fulfill her research duties. Because Dr. Navarro had expected to spend the next four to

five years focusing primarily on the DRK-12 grant project, she had turned down other opportunities—opportunities that she was unable to capitalize on following the grant termination.

111. The termination resulted in immediate financial harm. Neither Dr. Navarro nor Dr. Esquinca received the anticipated compensation for the year's worth of work they had already conducted. Dr. Navarro was unable to pay community partners or members of her advisory board at the end of each academic year as planned. These advisors—including classroom teachers, community partners, and educational researchers—had contributed expertise and time to the project with the expectation of compensation, and Dr. Navarro was left unable to honor those commitments.

112. The termination also abruptly ended the employment of three graduate students working with Dr. Navarro on the DRK-12 project. This termination disrupted their academic progress and professional development. The harm to these early-career researchers extends beyond the immediate project, as gaps in their publication records will impair their competitiveness in the academic job market.

113. The termination forced Drs. Esquinca and Navarro to seek alternative funding sources to maintain even minimal project activity. Dr. Esquinca secured a short-term bridge grant in the amount of $25,000 from the Spencer Foundation that went toward working with a second cohort of novice bilingual teachers. Dr. Esquinca also obtained approximately $25,000 in competitive funding from the graduate school's emergency fund, which allowed him and Dr. Navarro to maintain one of their three graduate student assistants for one more year. Finally, Dr. Esquinca personally contributed approximately $15,000 in incentive funds that he had received for other projects to pay for project participants' teaching incentives and materials for one cohort. This approximately $65,000 in replacement funding is a small fraction of the approximately $951,550.86 remaining on the original DRK-12 award and does not permit completion of the full scope of work originally planned.

114. The termination forced Dr. Navarro to change her entire original approach to the project. As conceptualized, her project would have involved a study where she and Dr. Esquinca shared their data with community partners. But without adequate funding, the fulsome recording of novice bilingual teachers' life histories could not be taken or shared, so that community partners

could use these case studies to enhance their recruitment and supplement their own data to understand the novice teacher experience. Instead of a large cohort of 20-30 novice bilingual teachers, Dr. Navarro could only support a small cohort of 5 novice bilingual teachers. Instead of an exploratory study that would grow and provide findings that could be used to fuel future studies and support more teachers and students, NSF's termination of the DRK-12 grant cut the line of research off before it could get off the ground.

115. The premature termination has damaged Dr. Navarro's professional reputation and standing in the science education research community. The effect is particularly acute given that the DRK-12 grant was Dr. Navarro's first grant for which she was named a Co-PI. This grant was intended to uplift her professional trajectory, but instead it has done the opposite. Termination of a DRK-12 grant—particularly a termination not based on any alleged deficiency in performance or compliance—sends a signal to the research community that the recipient's work is no longer valued or aligned with federal priorities, regardless of its scientific merit. Although her research directly advances NSF's congressionally mandated mission to promote participation of underrepresented groups in STEM, the public framing of her grant as an example of misused taxpayer funds has subjected her to scrutiny and criticism disconnected from the actual merit of her work. To this day, the NSF website listing for Dr. Navarro's grant denotes in bold, yellow highlighted font that it was administratively terminated.[32]

116. The termination has also harmed Dr. Navarro's ability to build and maintain the community partnerships that are essential to her research model. Her work in bilingual education depends on collaboration with K-12 teachers, school administrators, and community organizations serving bilingual students and communities. The abrupt cancellation of a long-term federally funded project undermines the trust necessary for these partnerships, as community partners reasonably question whether future collaborative commitments will be honored.

---

[32] U.S. Nat'l Sci. Found., Award Details: Award Abstract # 2300927, https://www.nsf.gov/awardsearch/show-award?AWD_ID=2300927 (last visited Oct. 14, 2026) [https://perma.cc/V6KT-XJ8H].

117. Even if Dr. Navarro were eventually able to secure replacement funding for this project—a difficult and uncertain prospect given the substantial sums at stake and the nature of Dr. Navarro's project—the delay and disruption have caused and continue to cause irreparable harm. Data collection windows tied to academic calendars have been missed. The novice bilingual teachers participating in Dr. Navarro's project did not obtain the depth and breadth of material, financial, and community support they had anticipated relying on as they launched their careers. Community partnerships have been destabilized. Graduate students have been forced to redirect their research plans. Publications that would have emerged from completed analyses have been delayed or abandoned entirely, creating gaps in Dr. Navarro's scholarly record that will affect her career trajectory for years to come.

118. Dr. Navarro was targeted because the title of her project and the proposal were full of words NSF did not like. The termination was intended to punish her specific viewpoints expressed through her research and the most vulnerable populations served by the grant: low-income students of color in under-resourced schools.

119. Dr. Navarro attempted to appeal the termination decision through the SDSU Research Foundation, the university's grant-managing entity. She received the same denial letter from Acting Division Director Scott-Morring that Dr. Visintainer received on the same day Dr. Visintainer received hers. This identical response confirmed that NSF terminated Dr. Navarro's grant not because of any allegation that she failed to perform her research, violated grant terms, or engaged in misconduct, but solely because NSF unilaterally determined that her congressionally mandated research on increasing STEM participation among underrepresented groups no longer "effectuate[d]" the agency's reinterpreted "priorities."

120. The termination of Dr. Navarro's DRK-12 grant has also created an ongoing chilling effect on her constitutionally protected speech and academic expression. Since the termination of her grant, Dr. Navarro has refrained from applying to NSF for any grants because of her negative experience with her DRK-12 grant and because her scholarly research requires the use of specific scientifically accurate and pedagogically necessary terminology and speech that NSF disfavors.

121. Dr. Navarro's fear is objectively reasonable. NSF has admitted that it used search terms, keywords, and phrases to identify grants that "expressed, or were presumed to express, viewpoints disfavored by the Administration, as set forth in Executive Orders or NSF's executive directives," and that it selected grants for termination based on those presumed viewpoints rather than any assessment of grant performance or compliance. *See Thakur*, ECF No. 211-5, Ex. E(1) § II, ¶¶ 3(a), 5–6, 9, at 6–7.

122. The chilling effect is particularly severe because the grants are competitive, and the government provided no project-specific justification for the termination and no explanation of what standards Dr. Navarro would need to meet to avoid future terminations (other than ostensibly to avoid research subjects that the Trump Administration deems ideologically unacceptable), with no opportunity for appeal, and no guidance on how to align future work with those unstated priorities. The practical effect is to discourage particular questions, explanatory frameworks, and educational approaches because of their presumed political meaning.

123. These harms are in addition to the loss of value to the public from Dr. Navarro's inability to complete groundbreaking research on how to support novice teachers engaging in bilingual STEM education—research that would provide insights into increasing bilingual teacher retention which in turn would increase participation and success of Latiné students in STEM fields. Dr. Navarro's research thus directly serves NSF's statutory mission and addresses a critical national need for diversifying the scientific workforce.

**3. Plaintiff Karina Garbesi's Grant Termination and Resulting Harm**

124. Dr. Karina Garbesi is a Professor Emerita in the Department of Anthropology, Geography, and Environmental Studies at California State University, East Bay ("CSUEB"). In the past she served as affiliated faculty at the University of California, Berkeley, and as program manager at Lawrence Berkeley National Laboratory where she led technical analyses for energy efficiency standards rulemakings, research on direct DC power systems, and national competitions for ultra-high efficiency appliances. She obtained her B.A. in Physics with High Honors, an M.S. in Energy and Resources, and a Ph.D. in Energy and Resources all from the University of California, Berkeley.

125. Dr. Garbesi's research focuses on energy, environment, and social justice, with particular emphasis on energy efficiency, renewable energy, and climate education. She has developed and implemented educational programs within and beyond the CSU System to expand the human capacity to assess, install, and maintain such systems and to give low-income students access to careers in the rapidly expanding renewable energy industry.

126. Funding from the Department of Energy, NSF, and private sources has supported Dr. Garbesi's research over her career, reflecting the merit and importance of her work to the scientific community and to the nation's educational infrastructure. Dr. Garbesi's research directly advances NSF's congressionally mandated mission to support STEM research and education and to develop "the full use of the human resources of the Nation in science and engineering," including by ensuring that "men and women, equally, of all ethnic, racial, and economic backgrounds" have equal opportunity in STEM fields. National Science Foundation Act of 1950, Pub. L. No. 81-507, 64 Stat. 149, 149; 42 U.S.C. §§ 1862, 1885(b).

**i. *NSF ITEST Grant Application and Award***

127. In August 2020, Dr. Garbesi submitted a grant application to NSF for an Innovative Technology Experiences for Students and Teachers ("ITEST") grant. The ITEST program supports applied research and development focused on increasing preK-12 students' interest in careers in information and communication technology and STEM through technology-based learning experiences.[33] Dr. Garbesi was the PI (along with five Co-PIs) on the grant proposal, titled "A Networked Improvement Community Approach to School-wide Transformation, Teacher Agency, and Minoritized Students' Climate Science Learning and Belonging." The project is referred to as the Climate Empowerment Learning Initiative, or CELI.

128. The CELI proposal addressed how to implement and nurture justice-centered, science-grounded, and solutions-oriented climate education, integrated school-wide into and across the curriculum at two low-income public schools in the Hayward Unified School District in the San

---

[33] U.S. Nat'l Sci. Found., Innovative Technology Experiences for Students and Teachers (ITEST), https://www.nsf.gov/funding/opportunities/itest-innovative-technology-experiences-students-teachers (last visited Oct. 14, 2026) [https://perma.cc/F4EF-94P8].

Francisco Bay Area. The two schools—Cesar Chavez Middle School and Tennyson High School—serve student populations that are 72-73% Latiné, 7-8% Asian, 5-6% Black, 7% Filipino, 3% Pacific Islander, and 2-3% White. Both schools accept nearly all of the district's newcomer students, including new immigrants, unaccompanied minors, and refugees.

129. The schools struggle to meet the needs of multicultural communities of mostly low-income students of color. Their teachers seek the means to capitalize on student strengths and passions in ways that can reduce the educational outcomes of social injustice: high rates of truancy, absences, behavioral issues, lack of engagement in the classroom and follow-through on assignments.

130. Dr. Garbesi's ITEST grant application requested funding commensurate with a four-year budget to support this multi-year research and curriculum-development project. Dr. Garbesi's application successfully navigated and satisfied NSF's rigorous peer-review process involving the approval of independent expert scientists who assessed the proposal for both "intellectual merit" and "broader impacts."

131. NSF awarded the ITEST grant to Dr. Garbesi on July 1, 2021, authorizing the proposal for a project period spanning four years, from July 1, 2021 through June 30, 2025, later extended for another year (Award No. 2049130). The Award Notice states that the total award amount was $1,499,507.97.

**ii. *NSF Grant Termination***

132. On April 25, 2025, California State University East Bay received the form email from NSF Grants (grants005@nsf.gov) purporting to terminate Dr. Garbesi's ITEST grant, Award No. 2049130.

133. The termination letter provided no grant-specific explanation for why Dr. Garbesi's award—which had been deemed meritorious through NSF's rigorous peer-review process, directly advanced NSF's statutory mission under 42 U.S.C. § 1885(b), and was producing significant educational outcomes—suddenly "no longer effectuate[d] the program goals or agency priorities." The letter made no allegation that Dr. Garbesi had failed to comply with award terms and conditions, engaged in research misconduct, or otherwise provided cause for termination.

134. CSUEB instructed Dr. Garbesi to discontinue any spending on the CELI project immediately upon receipt of the termination notice. She was given 30 days from the termination date to furnish a summary of progress under the award and an itemized accounting of allowable costs incurred prior to the termination date.

135. Dr. Garbesi's program manager at NSF, Toni Dancstep, gave repeatedly strong reviews of the CELI project and encouraged Dr. Garbesi to apply for future grants. Ms. Dancstep was not involved in the termination decision and found out about the termination at approximately the same time as Dr. Garbesi. Shortly after the termination, Ms. Dancstep left NSF and was immediately removed from the NSF email roster.

136. NSF gave no prior indication that Dr. Garbesi's grant would be terminated. She received consistently positive reviews from Ms. Dancstep and in fact, had been invited to apply for an NSF scaling grant to expand the CELI model to additional schools and districts.

137. The termination of Dr. Garbesi's ITEST grant is consistent with the termination of the University of California grants in the *Thakur* Litigation and NSF's admission therein that it based its terminations on specific viewpoints. Dr. Garbesi's project in substance matches several of the key words that the Cruz Report, and hence NSF, use as a basis for attack and termination, for example helping "minorities" and "climate justice." CSUEB also received the substantially identical, formulaic termination letters that Dr. Visintainer and the *Thakur* plaintiffs received.

***iii. Dr. Garbesi Suffered Harm from NSF Grant Termination***

138. Dr. Garbesi and her collaborators have suffered immediate and continuing harm as a result of the unlawful termination of her NSF ITEST grant.

139. On April 25, 2025, Dr. Garbesi received a stop-work notice from CSUEB's Office of Research and Sponsored Programs, instructing her to immediately refrain from incurring any new expenses on the terminated grant—essentially ordering her to cease all project activities. The effective termination date was April 25, 2025—the same day the notice was received—providing no opportunity to wind down the project in an orderly manner or to preserve work in progress.

140. Dr. Garbesi was in the fourth year of her ITEST grant when it was terminated, with substantial research findings already developed and significant community partnerships already

established. The original plan outlined in her NSF proposal was to implement and collect data on the network for three years, with data analysis and write-up scheduled primarily for year four. However, with the onset of the COVID-19 pandemic and the associated chaos of on-again off-again school closures, the bulk of the data analysis and writing was moved to year five, which would have been completed through the one-year extension.

141. The abrupt termination prevented Dr. Garbesi from completing final data analysis, preparing manuscripts for publication, and disseminating findings to the broader educational research community.

142. The termination resulted in immediate financial harm. Dr. Garbesi lost half a year's income at 50% time. She was unable to complete the planned work and support members of her research team. The grant supported at least two other Co-PIs, one post-doctoral researcher, a couple of undergraduate researchers, and an external researcher who was part of the grant at BSCS Science Learning. On the schools' side, all of the participating teachers were receiving stipends for participation, which were terminated.

143. The termination also immediately ended Dr. Garbesi's employment at the university. As a part-time faculty member working under the terms of a collective bargaining agreement between CSU and the CSU faculty union, the ITEST grant project provided the only source of university employment for Dr. Garbesi at that time.

144. The termination forced graduate students and early-career researchers working on the CELI project with Dr. Garbesi to abandon their research plans. Dr. Eric Nolan, a post-doctoral researcher whom the grant supported, suffered serious damage to his career. Dr. Emily Harris, a research scientist and Co-PI on the project, also suffered harm to her career development. These early-career researchers had designed their professional development around the grant-funded work, and the termination disrupted their academic progress and professional trajectories.

145. The premature termination has damaged Dr. Garbesi's professional reputation and standing in the environmental studies and climate education research communities. Although her research directly advances NSF's congressionally mandated mission to promote participation of underrepresented groups in STEM, the termination of her grant sends a signal to the research

community that the recipient's work is no longer valued or aligned with federal priorities, regardless of its scientific merit. To this day, the NSF website listing for Dr. Garbesi's grant denotes in bold, yellow highlighted font that it was administratively terminated.[34]

146. The termination has also harmed Dr. Garbesi's ability to build and maintain the community partnerships that are essential to her research model. Her work in climate education depends on collaboration with K-12 teachers, school administrators, and community organizations serving diverse students of color. The abrupt cancellation of a long-term federally funded project undermines the trust necessary for these partnerships, as community partners reasonably question whether future collaborative commitments will be honored.

147. The termination forced Dr. Garbesi to seek alternative funding sources to maintain even minimal project activity. She secured emergency bridge funding from the Spencer Foundation's Rapid Response Bridge Funding Program, in association with the Kapor Foundation, the William T. Grant Foundation, and the Alfred P. Sloan Foundation. Dr. Garbesi received a competitive grant of $25,000—the maximum allowable under the program—in September 2025. This bridge funding was specifically designed to support scholars whose active NSF grants were terminated.

148. Some collaborators and teachers were able to raise very modest last-minute replacement funding with Dr. Garbesi's pro bono support. A teacher and coach who had been in contact with Amazon Web Services was able to secure approximately $10,000 to help keep some aspects of the program going. Hayward Promise Neighborhoods, whose director was a Co-PI on Dr. Garbesi's CELI project, provided some gap funding until its program was also cut by DOGE. Altogether, Dr. Garbesi secured approximately $50,000 to $80,000 in emergency replacement funding—nowhere near the $358,542.55 she would have been able to use under her ITEST grant.

149. These emergency measures provide only temporary support and represent a small fraction of the NSF award remaining. The replacement funding does not permit completion of the

---

[34] U.S. Nat'l Sci. Found., Award Details: Award Abstract # 2049130, https://www.nsf.gov/awardsearch/show-award?AWD_ID=2049130 (last visited Oct. 14, 2026) [https://perma.cc/DP6X-6MD8].

full scope of work originally planned. Even with this bridge funding, Dr. Garbesi and her team had to abandon at least one major paper—the comprehensive analysis of the entire trajectory of the project—because the analytical effort required to complete it cannot be achieved within the limited budget and time frame.

150. The Spencer Foundation bridge grant enabled Dr. Garbesi to continue developing four papers for which all necessary data collection had been completed. These papers include: (1) a case study examining how a Networked Improvement Community ("NIC") successfully implemented interdisciplinary, justice-centered climate education across the middle school despite traditional structural barriers of schooling; (2) a description of the evolution of the CELI project over four years, summarizing key lessons learned and major project outcomes; (3) a case study investigating how concerted efforts to promote climate education at a high school using the NIC model resulted in systemic changes at the district level to facilitate the expansion of climate curriculum across multiple schools; and (4) a set of interdisciplinary climate justice learning goals co-designed from various subject areas using a Head, Heart, Hands approach.

151. Even with the emergency funding, Dr. Garbesi was unable to complete the most significant paper from the project: the comprehensive analysis that would have investigated the reasons behind the profound success of the project, which greatly exceeded the researchers' own expectations. Completing that analysis would require future support that may not be available.

152. Even if Dr. Garbesi were eventually able to secure replacement funding for the abandoned portions of this project—a difficult and uncertain prospect given the substantial sums at stake and the specialized nature of ITEST grant support—the delay and disruption have caused and continue to cause irreparable harm. Data collection windows tied to academic calendars have been missed. Community partnerships have been destabilized. Graduate students and early-career researchers have been forced to redirect their research plans. Publications that would have emerged from completed analyses have been delayed or abandoned entirely, creating gaps in Dr. Garbesi's scholarly record and those of her collaborators.

153. Dr. Garbesi was targeted because the title of the project and the proposal were full of words NSF did not like. The termination was intended to punish her specific viewpoints expressed

in her research and the most vulnerable populations served by the grant: low-income students of color in under-resourced schools.

154. Dr. Garbesi attempted to appeal the termination decision through CSUEB's Office of Research and Sponsored Programs. On May 2, 2025, CSUEB submitted an appeal letter explaining that the grant was fully aligned with NSF's mission and detailing the harm to the student population served by the project. Dr. Garbesi never received a response to her appeal.

155. The termination of Dr. Garbesi's ITEST grant has also created an ongoing chilling effect on her constitutionally protected speech and academic expression. Prior to her ITEST grant's termination, Dr. Garbesi had been invited to apply for an NSF scaling grant to expand the CELI model to additional schools and districts. However, she ultimately did not apply for this grant, because she understood that it would be pointless to apply for funding to expand a project that NSF had already determined did not meet its priorities. Since the termination of her grant, Dr. Garbesi has refrained from applying to NSF for any grants as the result of her negative experience with her ITEST grant.

156. Dr. Garbesi's fear is objectively reasonable, as NSF itself admitted in the *Thakur* Litigation that it used search terms, keywords, and phrases to identify grants presumed to express viewpoints the administration no longer wishes to subsidize, and that it selected grants for termination based on those presumed viewpoints rather than any assessment of grant performance or compliance. *Thakur*, ECF No. 211-5, Ex. E(1), § II, ¶¶ 3(a), 5–6, 9, at 6–7.

157. The chilling effect is particularly severe because the grants are competitive, and the government provided no project-specific justification for the termination and no explanation of what standards Dr. Garbesi would need to meet to avoid future terminations (other than ostensibly to avoid research subjects that the Trump Administration deems ideologically unacceptable), with no opportunity for appeal, and no guidance on how to align future work with those unstated priorities. The practical effect is to discourage particular questions, explanatory frameworks, and educational approaches because of their presumed political meaning.

158. These harms are in addition to the loss of value to the public from Dr. Garbesi's inability to complete groundbreaking research on how to implement school-wide climate education

that is justice-centered, science-grounded, and solutions-oriented for diverse student populations—research that directly serves NSF's statutory mission and addresses a critical national need for preparing all students, particularly those from historically underrepresented groups, to understand and respond to climate change.

**4. The Trump Administration Threatens Additional, Illegal Funding Cuts to the CSU System**

159. In the months leading up to the filing of this complaint, federal agencies have continued to signal their intent to terminate additional research grants at institutions deemed insufficiently aligned with the Trump Administration's political and ideological priorities. On information and belief, based on public statements by administration officials, stipulated admissions in federal court from NSF officials, and the pattern of terminations targeting grants with climate justice, diversity, equity, and inclusion themes, grants to CSU researchers—including those at SJSU, where Plaintiff Visintainer conducts her research—remain vulnerable to categorical termination based on keyword searches, political targeting, and viewpoint-based screening rather than scientific merit or compliance with grant terms.

160. On information and belief, based on the ongoing implementation of Executive Orders Nos. 14151 and 14173 and related directives, the CSU System faces imminent risk of additional grant terminations. The CSU System has made leading contributions to research that benefits the public, particularly in fields that advance educational equity, serve Hispanic-Serving Institutions,[35] and prepare the next generation of STEM educators and researchers. These contributions are now at risk as federal agencies implement the Trump Administration's directive to eliminate research deemed inconsistent with the President's political agenda.

161. Unless enjoined, the mass termination of federal research grants will cause irreparable harm not only to individual researchers like Plaintiffs, but to the CSU System's research

---

[35] Indeed, NSF terminated at least half a dozen CSU grants that related to Hispanic Serving Institutions. *See* NSF, *Is there a publicly available list of the awards NSF has terminated?*, https://www.nsf.gov/updates-on-priorities#termination-list (last updated July 24, 2026) [https://perma.cc/SC3H-YUGZ].

mission, to the students and communities served by CSU research, and to the national interest in maintaining a robust, diverse, and merit-based scientific enterprise.

### F. Unless Enjoined, Grant Terminations Will Cause Irreparable Harm to Plaintiffs, the Class, and the Nation.

162. Plaintiffs and the proposed Class have suffered and will continue to suffer the following injuries as a direct result of Defendants' conduct:

- Continued interruption or abandonment of ongoing research projects as a direct result of the loss of previously awarded grants;
- Attendant reduction of employment for or layoffs of researchers and their staff, including graduate students whose thesis research and career development depend on grant-funded projects;
- Career disadvantage, including loss of opportunities to publish research, inability to attend project-relevant conferences, reduced ability to obtain related or follow-on grants, and long-term reputational harm from association with terminated awards;
- Expenditure of considerable time and effort to find substitute funding, including emergency grant applications and outreach to private foundations;
- The need to support project team members with discretionary funds or to otherwise improvise short-term solutions to massive funding shortfalls;
- Reputational injury, including loss of trust from community partners integral to ensuring that public university research is responsive and relevant to local needs, and public association with politically motivated investigations characterizing merit-based research as wasteful spending; and
- Violation of constitutional rights, including the First Amendment right to engage in viewpoint-diverse research and the Fifth Amendment right to due process before deprivation of property interests in awarded grants.

163. These direct, concrete injuries to Plaintiffs and similarly situated researchers have an inexorable and damaging ripple effect on the research mission of individual researchers and research teams; on the research mission of the CSU System itself; on the students and educators who benefit

from science education research; on the citizens of California; and on all Americans who depend on a scientifically literate population and a diverse STEM workforce.

164. This Court has already provided preliminary injunctive relief to University of California researchers whose federal grants, including NSF grants, were terminated under similar or identical circumstances in the *Thakur* Litigation. *Thakur v. Trump*, 787 F. Supp. 3d 955 (N.D. Cal. 2025), *aff'd in part, rev'd in part*, 176 F.4th 1187 (9th Cir. 2026) (per curiam). In its ruling, the Court held that all factors necessary for injunctive relief favored the *Thakur* plaintiffs, and that the plaintiffs were likely to succeed on their claims that Defendants' grant terminations based on President Trump's Executive Orders concerning DEI violated the First Amendment and the Administrative Procedure Act. The Ninth Circuit subsequently affirmed this portion of the Court's order restoring funding to the *Thakur* plaintiffs. Plaintiffs and Class Members deserve no less here.

## V. CLASS ALLEGATIONS

165. Tammie Visintainer, Melissa Navarro Martell, and Karina Garbesi ("Named Plaintiffs" or "Class Representatives") bring this action as a class action for declaratory and injunctive relief pursuant to Federal Rules of Civil Procedure 23(a)(1)–(4) and 23(b)(2). They bring this suit on behalf of themselves and all similarly situated CSU researchers whose federally funded NSF grants have been terminated or suspended by Defendants absent: (a) a declaratory judgment that NSF's directives and actions implementing the April 18 Memorandum are illegal; and (b) injunctive relief enjoining further terminations and restoring the terminated grants to enable Class Members to complete their interrupted work. These Named Plaintiffs seek certification of a Class defined as follows:

> All California State University researchers, including faculty, staff, academic appointees, and employees across the California State University system who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants by the NSF (or its sub-agencies) that are terminated pursuant to Executive Orders Nos. 14151 or 14173, from and after January 20, 2025.
>
> Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.

166. This action meets all of the Rule 23(a) prerequisites for maintaining a class action. The proposed Class is sufficiently numerous that individual joinder of all its members is

impracticable, satisfying Rule 23(a)(1). NSF has published a list of its terminated grants that includes over 30 grants terminated across the CSU System.[36] Plaintiffs are informed and believe that dozens of researchers' grants and work, and their research staff's jobs, have been and will be impacted by such conduct. Review of the terminated grants suggests terminations occurred because the grant titles and abstracts contain now-suspect DEI-related words such as "equity" and "minority."

167. The claims of the Class Members share pivotal common questions of law and fact, including but not limited to: whether the Defendants' actions pursuant to the Executive Orders and directives described in this Complaint violate Class Members' First Amendment right to free speech and Fifth Amendment right to due process; whether they are unconstitutional and unlawful exercises of executive power, because they usurp Congress's spending authority; whether they are further unlawful because they violate the enabling statutes of NSF; and whether Defendants' actions are contrary to law, or otherwise in excess of statutory authority, or otherwise without observance of proper procedure in violation of the APA.

168. Because the claims of the Class share common issues of law and fact, they will not require individualized determinations of the circumstances of any plaintiff, and satisfy Rule 23(a)(2) for purposes of the requested declaratory and injunctive relief.

169. The claims of the Class Representatives are typical of the claims of the members of the Class, because they arise out of the Defendants' common conduct, satisfying Rule 23(a)(3). Like other members of the class, the Class Representatives have been concretely harmed economically, professionally, and reputationally by Defendants' unlawful actions in categorically terminating or delaying their research grants under color of President Trump's Executive Orders and/or at the direction of DOGE. The timing and sheer volume of these terminations (NSF terminated 1,667 grants to date,[37] and DOGE's website boasts of over 15,000 grant terminations nationwide, most of which occurred in the Trump Administration's first 100 days[38]) shows that these determinations

---

[36] NSF, *Is there a publicly available list of the awards NSF has terminated?*, *supra* note 35.

[37] *Id.*

[38] Dep't of Gov't Efficiency, Wall of Receipts (last updated Jan. 1, 2026), https://doge.gov/savings.

were without due process or due regard for the individual merits, scientific importance, or public benefit of the projects affected. Each of these actions, independently and collectively, has caused harm to the Class Representatives and the Class Members.

170. The Class Representatives will fairly and adequately protect the interests of the Class, satisfying Rule 23(a)(4). They will defend the rights of all proposed class members fairly and adequately, and have no interest that is now or may be potentially antagonistic to the interests of the Class. The attorneys representing the Class Representatives include constitutional, civil rights, and administrative law experts and litigators with decades of experience in their respective fields. Counsel also have experience in class action litigation and have been appointed as class counsel in federal litigation. These attorneys may and should be appointed as class counsel in this action.

171. The members of the Class are readily ascertainable through Defendants' own grant records, and the grant-related communications they have issued to Class Members pursuant to Executive Orders and/or at the direction of the Trump Administration and/or DOGE.

172. Through federal NSF research grant cancellations, suspensions, and delays imposed categorically, pursuant to Executive Orders or other Trump Administration directives, in violation of the APA, and in violation of other statutes and the Constitution as alleged in this Complaint, Defendants have acted, have threatened to act, and will continue to act on grounds generally applicable to the Class, thereby making final equitable and declaratory relief appropriate to the Class as a whole. The Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(2).

173. In the alternative to certification under Rule 23(b)(2), Plaintiffs and the Class seek to maintain a class action with respect to particular issues under Rule 23(c)(4).

174. Numerous individual lawsuits alleging similar conduct and claims would disserve the interests of judicial economy, as well as the interests of litigants and the public in the just, speedy, and inexpensive determination of these claims.

## VI. CLAIMS FOR RELIEF

### COUNT I
### Violation of First Amendment

175. Plaintiffs reallege all paragraphs above as if fully set forth herein.

176. The Supreme Court has long recognized that academic freedom is a special concern of the First Amendment:

> Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. The classroom is peculiarly the marketplace of ideas. The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, (rather) than through any kind of authoritative selection.

*Keyishian*, 385 U.S. at 603 (quotations and citations omitted).

177. The Supreme Court has made clear that, when the government creates a program "designed to facilitate private speech, not to promote a governmental message," it cannot pick and choose which projects to fund based on the viewpoint the recipient would express (or be expected to express) in or about their work. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001). Defendants can set priorities regarding what topics to fund consistent with the First Amendment, but what they cannot do is set or implement priorities in a manner aimed at suppressing disfavored viewpoints from being communicated through private speech.

178. "'Viewpoint discrimination' represents an even more 'egregious form' of content regulation from which governments must nearly always 'abstain.'" *Chiles v. Salazar*, 607 U.S. 627, 628 (2026) (quoting *Rosenberger*, 515 U.S. at 829).

179. The First Amendment's prohibition on viewpoint discrimination applies where, as here, the government is discriminating in the provision of government support for private expression. The government has unparalleled financial resources, and when it uses them not to express its own views but to support private speech, it cannot leverage that funding to skew the marketplace of ideas to suppress views the government disfavors.

180. "[T]he government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression." *Rosenberger*, 515 U.S. at 828 (citation omitted). "Discrimination against speech because of its message is presumed to be unconstitutional." *Id.*; *see also Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024) ("[G]overnmental actions seeking to suppress a speaker's particular views are presumptively unconstitutional." (citing *Rosenberger*, 515 U.S. at 830)). "[E]ven in the provision of subsidies, the Government may not aim at the suppression of dangerous ideas." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (cleaned up). Nor may the government reject "a whole class of projects . . . based on viewpoint alone," or use federal funding awards—such as the CAREER, ITEST, or DRK-12 grants—"to drive certain ideas or viewpoints from the marketplace." *R.I. Latino Arts v. Nat'l Endowment for the Arts*, 777 F. Supp. 3d 87, 107 (D.R.I. 2025) (cleaned up) (quoting and discussing *Finley*, 524 U.S. at 587).

181. Defendants' actions as alleged herein are "the product of invidious viewpoint discrimination." *Finley*, 524 U.S. at 587. Defendants terminated Plaintiffs' grants based on the views reflected in its research and work—or at least the views as purportedly perceived by Defendants. Defendants did so in an effort to drive these viewpoints out of the marketplace of ideas. And Defendants' intent was clear from both their contemporaneous public statements and the termination letter itself. The Trump Administration singled out Plaintiffs' and Class Members' NSF grants because the viewpoints purportedly conveyed in the grants' statement of work or abstracts conflicted with the Trump Administration's views. In short, Plaintiffs' research and work pursuant to the NSF grants were targeted because they purportedly reflected viewpoints and beliefs disfavored by the Trump Administration. NSF has admitted to engaging in viewpoint discrimination in determining which grants to terminate.

182. Defendants also penalized Plaintiffs' protected speech and abridged their academic freedom by withdrawing already-awarded grants because Plaintiffs engaged in speech disfavored by the government. The termination therefore constituted not only viewpoint discrimination but also retaliation in violation of the First Amendment.

183. To succeed on a retaliation claim, Plaintiffs must show "(1) [they] engaged in constitutionally protected activity; (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill speech." *Koala v. Khosla*, 931 F.3d 887, 905 (9th Cir. 2019) (quoting *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016)).

184. Terminating grants constitutes an adverse action under the retaliation framework. *See, e.g., Nat'l Pub. Radio, Inc. v. Trump*, 827 F. Supp. 3d 48, 84 (D.D.C. 2026); *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 121 (D. Mass. 2025).

185. Defendants have chosen which grants to terminate based on Plaintiffs' and Class Members' past protected speech, including speech within the classroom setting or the way in which they described and characterized their research work.

186. Furthermore, Defendants' actions alleged herein have an ongoing chilling effect on Plaintiffs' speech. They signal to Plaintiffs, the putative class, and the broader research community that work associated with the view that exclusion or unequal access warrants corrective attention—whether in research agendas, program descriptions, presentation titles, or other scholarly work—may be punished. This chilling effect is particularly acute in the context of the NSF programs in which Plaintiffs participated, where research agendas and educational programming must be planned years in advance and where researchers must communicate candidly about program goals in competitive applications. The practical effect is to discourage particular questions, explanatory frameworks, and educational approaches because of their presumed political meaning.

187. Defendants' actions are neither justified by any substantial or compelling government interest nor narrowly tailored to serve any such interest.

188. Accordingly, the Court should declare Defendants' actions unconstitutional and enjoin them.

**COUNT II**
**Violation of Fifth Amendment (Due Process)**

189. Plaintiffs reallege all paragraphs above as if fully set forth herein.

190. The Fifth Amendment guarantees that no person be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

191. The Due Process Clause of the Fifth Amendment requires due process of law before the deprivation of a constitutionally protected interest and fair notice of what conduct is forbidden or required.

192. Defendants' abrupt termination deprived Plaintiffs of constitutionally protected liberty and property interests without due process. Plaintiffs' liberty and property interests include their ability to pursue their profession as academic researchers and principal investigators, their professional reputation associated with stewardship of major federal awards, and their concrete economic and professional reliance on a multi-year federal research award under their direction.

193. Defendants provided no meaningful pre-deprivation process. They did not provide advance notice of a grant-specific concern tied to the actual implementation of the research. They did not provide a meaningful opportunity for Plaintiffs to be heard. They did not offer a corrective-action pathway tailored to actual program practices. Defendants instead relied on selective quotations and a biased characterization of language in Plaintiffs' project titles and descriptions to summarily terminate the grants.

194. Defendants also failed to provide fair notice of what conduct was required to avoid termination. By treating general, undefined concepts and words—especially concepts and words explicitly responsive to the Notice of Funding Opportunities' prescribed priorities—as grounds for termination after the award was made and reaffirmed, Defendants imposed an uncertain and retroactive standard that invites arbitrary enforcement and undermines the stability required for multi-year research programs.

195. Accordingly, the Court should declare Defendants' actions unconstitutional and enjoin them.

**COUNT III**
**Violation of Separation of Powers**

196. Plaintiffs reallege all paragraphs above as if fully set forth herein.

197. Article I of the United States Constitution vests Congress with the legislative power to create departments, agencies, and offices within the executive branch, define their duties, and fund their activities. U.S. Const. art. I, § 1; id. § 8, cl. 18. Administrative agencies, including NSF, whose grant terminations are at issue in this case, are "creatures of statute" that possess only the authority Congress has provided. *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab*., *OSHA*, 595 U.S. 109, 117 (2022) (per curiam); see also *Myers v. United States*, 272 U.S. 52, 129 (1926) (Congress's legislative power includes "the establishment of offices . . . [and] the determination of their functions").

198. The Constitution also "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). Congress exercises its constitutional spending authority by appropriating funds to agencies, including NSF, to carry out specified activities.

199. The Executive is required to administer those funds in accordance with Congress's statutory directions. Specifically, the Constitution requires the President to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The Take Care Clause assures that "Congress makes the laws and the President faithfully executes them." *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014) (cleaned up).

200. The executive branch has no constitutional authority to refuse to carry out laws enacted by Congress, and it has no constitutional authority to block, amend, subvert, or delay spending appropriations based on the President's own policy preferences. For nearly two hundred years, it has been established that a president violates the Take Care Clause when he overrides statutes enacted by Congress or refuses to execute such statutes or their implementing regulations. *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838).

201. A President's Executive Order cannot lawfully override Congress's express direction. The President "is without authority to set aside congressional legislation by executive order." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999). Rather,

the "President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

202. Defendants' decision to unilaterally cancel duly awarded grants on the basis that they disagree with NSF's congressional mandate violates the separation of powers.

203. This Court has jurisdiction to enjoin federal officials from violating the Constitution, including the separation of powers. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

204. Because Defendants' actions violate the separation of powers, the Court should declare Defendants' actions unconstitutional and enjoin them.

**COUNT IV**
**Violation of Administrative Procedure Act:**
**Contrary to Law (5 U.S.C. § 706(2)(B))**

205. Plaintiffs reallege all paragraphs above as if fully set forth herein.

206. The APA directs courts to "hold unlawful and set aside agency action" that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

207. The April 18 Memorandum from the NSF Director was a final agency action implementing President Trump's Executive Orders, including but not limited to Executive Orders Nos. 14151 and 14173. Based on the directives of the April 18 Memorandum, NSF (together with DOGE) adopted the search terms, methodology, and grant database of the Cruz Report to identify NSF grants for termination.

208. As alleged in Count I, Defendants' actions are contrary to the constitutional rights enshrined in the First Amendment, and Plaintiffs have suffered a legal wrong as a result of those actions.

209. As alleged in Count II, Defendants' actions are contrary to the constitutional rights of due process enshrined in the Fifth Amendment, and Plaintiffs have suffered a legal wrong as a result of those actions.

210. As alleged in Count III, Defendants' actions violate the Constitution's provisions concerning the separation of powers, and Plaintiffs have suffered a legal wrong as a result of those actions.

211. Defendants' actions are further contrary to law in that they violate statutes in which Congress has mandated particular action from NSF. Congress required NSF to "[d]evelop intellectual capital, both people and ideas, with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering" in order to achieve NSF's goals of maintaining world leadership in STEM, promoting new knowledge in service to society, and achieving excellence in U.S. STEM education at all levels. 42 U.S.C. § 1862k(a)(6)(B), (b)(1). Congress expressly recognized and declared that there exists a need for "substantial support, from currently available research and educational funds, for increased participation in science and engineering by women, minorities, and persons with disabilities," and that "the impact on women, minorities, and persons with disabilities which is produced by advances in science and engineering must be included as essential factors in national and international science, engineering, and economic policies." *Id.* § 1885(b); *see also id.* § 1862s-5.

212. Defendants' actions in terminating Plaintiffs' grants contravened precisely these statutes, and Plaintiffs have suffered a legal wrong as a result of those actions.

213. Accordingly, the Court should hold unlawful and set aside Defendants' actions.

## COUNT V
## Violation of the Administrative Procedure Act:
## In Excess of Statutory Jurisdiction, Authority, or Limitations (5 U.S.C. § 706(2)(C))

214. Plaintiffs reallege all paragraphs above as if fully set forth herein.

215. The APA directs a reviewing court to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

216. The April 18 Memorandum from the NSF Director was a final agency action implementing President Trump's Executive Orders, including but not limited to Executive Orders Nos. 14151 and 14173. Based on the directives of the April 18 Memorandum, NSF (together with DOGE) adopted the search terms, methodology, and grant database of the Cruz Report to identify NSF grants for termination.

217. Defendants have no constitutional or statutory authority to abruptly and unilaterally terminate approved and obligated NSF grants.

218. As detailed in Count III, Defendants' actions violate the principle of separation of powers and usurp Congress's power of the purse, and are therefore in excess of statutory jurisdiction, authority, or limitations.

219. Defendants' termination decisions are further in excess of statutory jurisdiction, authority, or limitations because Defendants applied a retroactive and undisclosed policy that treated compliance with NSF's published priorities and Notices of Funding Opportunity as a basis for later termination. Defendants cannot lawfully transform established competition criteria into a post-award enforcement cudgel that cancels already-awarded grants based on a change in political viewpoint, absent lawful procedures and lawful non-retroactive standards consistent with the authorizing statute and the governing regulatory framework.

220. Nor does OMB's Uniform Grant Guidance provide Defendants with such unfettered authority. Defendants' actions are contrary to a reasonable interpretation of 2 C.F.R. § 200.340, historical practice, prior agency guidance related to the regulation, and the structure of the grant program as established by Congress.

221. In addition, Defendants' new priorities, and the grant terminations pursuant to those new priorities, directly contradict the statutes governing NSF activities. Congress directed NSF to carry out its mission by "[d]evelop[ing] intellectual capital, both people and ideas, with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering." 42 U.S.C. § 1862k(b)(1); *see also* 42 U.S.C. § 1862s-5. Plaintiffs' grants fall squarely within this congressionally mandated strategy. And yet, Defendants used the mere mention of such emphases as a reason to terminate Plaintiffs' grants.

222. Accordingly, the Court should hold unlawful and set aside Defendants' actions.

**COUNT VI**
**Violation of the Administrative Procedure Act:**
**Without Observance of Procedure (5 U.S.C. § 706(2)(D))**

223. Plaintiffs reallege all paragraphs above as if fully set forth herein.

224. The APA directs a reviewing court to "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

225. The April 18 Memorandum from the NSF Director was a final agency action implementing President Trump's Executive Orders, including but not limited to Executive Orders Nos. 14151 and 14173. Based on the directives of the April 18 Memorandum, NSF (together with DOGE) adopted the search terms, methodology, and grant database of the Cruz Report to identify NSF grants for termination.

226. Defendants' termination decision was issued without observance of procedure required by law. For example, Defendants did not appear to act pursuant to—or indeed even have in place—the procedures required by 2 C.F.R. § 200.342. Defendants terminated Plaintiffs' grants effective immediately without an adequate process to provide fair notice, to allow a meaningful response regarding the grant's actual implementation, or to address the reliance interests inherent in the multi-year grant award structure. Defendants' actions imposed sweeping consequences on Plaintiffs and an ongoing research enterprise without a process commensurate with the magnitude of the deprivation.

227. Plaintiffs, as principal investigators relying on the funds, have been and will continue to be harmed by Defendants' unlawful actions, including ongoing disruption, closeout burdens, reputational harm, and continued impairment of their—and others'—ability to perform their research and other critical educational functions.

228. Accordingly, the Court should hold unlawful and set aside Defendants' actions.

**COUNT VII**
**Non-Statutory Review *Ultra Vires* – Executive Action in Excess of Statutory Authority**

229. Plaintiffs reallege all paragraphs above as if fully set forth herein.

230. Federal courts have the power in equity to grant injunctive relief with respect to violations of federal law by federal officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). The Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal law. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949); *Murphy Co. v. Biden*, 65 F.4th 1122, 1128–29 (9th Cir. 2023) (finding jurisdiction to review "constitutional challenges to presidential acts" and "actions by

subordinate executive branch officials that extend beyond the delegated statutory authority—*i.e.*, *ultra vires* actions").

231. Defendants acted without lawful authority in issuing the April 18 Memorandum and subsequently terminating lawfully awarded grants.

232. Congress established objectives for NSF and set forth detailed parameters to govern the implementation of its mission, including specific goals and the process and criteria for designating and awarding grant funding to recipients. *See, e.g.*, 42 U.S.C. §§ 1862k(b)(1), 1862s-5, 1885. Defendants are statutorily required to implement NSF programs according to these parameters.

233. Nothing in NSF's enabling statutes or any other statute provides Defendants with the authority to rewrite criteria for using the funds once lawfully awarded or to terminate grants arbitrarily based on a new administration's different policy preferences.

234. Defendants' interpretation of their authority is incompatible with the NSF mission, goals, and policies as defined by Congress and contradicts the very language of the statutes.

235. Accordingly, the Court should declare Defendants' actions *ultra vires* and unlawful.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court certify a CSU Researchers Class pursuant to Fed. R. Civ. P. 23(a)(1)-(4) and 23(b)(2), enter judgment in favor of Plaintiffs and the certified Class as defined above, and award Plaintiffs and the certified Class the following relief:

A. Declare as unlawful and set aside the April 18 Memorandum and any actions taken in accordance therewith as violative of the Constitution's separation of powers and the First and Fifth Amendment protections of free speech and due process;

B. Declare as unlawful and set aside the April 18 Memorandum and any actions taken in accordance therewith as violative of the Administrative Procedure Act and agency-specific statutes and regulations, including congressional directives and appropriations acts;

C. Declare as *ultra vires* Defendants' decisions and implementation of the April 18 Memorandum to Plaintiffs and the Class;

D. Grant permanent injunctive relief to enjoin Defendants from implementing the April 18 Memorandum in violation of the Constitution's First Amendment, Fifth Amendment, and separation of powers, including cutting off grantee access to congressionally appropriated funding; from giving effect to the violative terminations, or undertaking any similar violative action to terminate additional duly awarded agency grants; and to return to the lawful and orderly grant procedures they employed prior to January 20, 2025;

E. Appoint Named Plaintiffs as Class Representatives, and the undersigned counsel as Class Counsel, upon certification of a Class pursuant to Fed. R. Civ. P. 23(g);

F. Designate such additional Class Representatives, Class Counsel, and sub-classes as the Court may deem appropriate at any time before final judgment, pursuant to Fed. R. Civ. P. 23(c)(1)(C) and 23(c)(5);

G. Award Plaintiffs and counsel for the proposed Class reasonable costs and attorneys' fees; and

H. Issue such other relief as the Court deems just and proper.

Dated: Oct. 30, 2026

Respectfully submitted,

*/s/ Kunyu Ching*

Kunyu Ching CA #292616
Gary DiBianco DC #458669*
**LAWYERS FOR GOOD GOVERNMENT**
1319 F St. NW, Suite 301
PMB 181
Washington, DC 20004
Phone: (404) 913-5529
kunyu@lawyersforgoodgovernment.org
gary@lawyersforgoodgovernment.org

Courtney Stuart-Alban CA #225513
Juan Pablo Alban CA #218144
**STUART ALBAN LAW PC**
87 N Raymond Ave, Suite 200
Pasadena, CA 91103
Phone: (323) 208-9540
courtney@stuartalbanlaw.com
jp@stuartalbanlaw.com

*Attorneys for Plaintiffs and the Proposed Class*

**pro hac vice* application forthcoming